Robert JACKSON, Plaintiff,

v.

Richard J. ELROD, Philip H. Hardiman, John Blanks, Robert N. Glotz, Willard Sullivan, Louis Quaglia, Amos Bullocks, Roy Patrick, John Does 1–5 and Jane Does 6–10, Defendants.

No. 86 C 1817.

United States District Court, N.D. Illinois, E.D.

Oct. 14, 1987.

On Motion to Modify Nov. 9, 1987.

Robert D. Allison, Chicago, Ill., for plaintiff.

Madeleine S. Murphy, Asst. States Atty., Chicago, Ill., for defendants.

## MEMORANDUM OPINION

PRENTICE H. MARSHALL, District Judge.

Plaintiff Robert Jackson, a pretrial detainee at Cook County Jail, seeks partial summary judgment against five named defendants—Richard J. Elrod, former Cook County sheriff; Philip H. Hardiman, former director of the Cook County Department of Corrections; Robert Glotz, the jail's security chief; and John Blanks and Willard Sullivan, both division superintendents at the jail. Jackson's allegations of first and fourteenth amendment violations by jail officials were detailed in our denial of a motion to dismiss. *Jackson v. Elrod,* 655 F.Supp. 1130 (N.D.Ill.1987). At this juncture, we consider only these defendants' liability for alleged policies of barring detainees' receipt of all hardcover books and of not informing detainees of such rejections.

First, however, we revisit an issue left undecided in our earlier opinion: by what standard should we should evaluate these policies? *See id.,* 655 F.Supp. at 1138. Defendants would have us uphold them if they prove reasonably related to a legitimate governmental interest. Defendants' Reply Memorandum to Plaintiff's Motion for Partial Summary Judgment [Def.Mem.] at 4. The American Booksellers Association, in an *amicus curiae* brief filed on plaintiff's behalf, argues that heightened scrutiny should apply. Memorandum of Points and Authorities by American Booksellers Association at 6. Plaintiff says it doesn't matter, because defendants' policies must fall under either standard. *See* Plaintiff's Memorandum in Support of Partial Summary Judgment as to Liability [Plf. Mem.] at 5. To assess these contentions, we examine three Supreme Court opinions pertaining to prisoners' constitutional rights.

In *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), officials unsuccessfully defended their policy of screening all convicted prisoners' mail, censoring that which they found objectionable. The first amendment permits such restraints, the Court held, only when they "further an important or substantial governmental interest unrelated to the suppression of expression" and are "no greater than is necessary or essential to the protection of the particular governmental interest involved." *Id.* at 413, 94 S.Ct. at 1811. The Court did not determine to what degree the Constitution protected prisoners *per se,* but based its decision on the "consequential restriction on the First and Fourteenth Amendment rights of those who are not prisoners." *Id.* at 409, 94 S.Ct. at 1809.

Prisoners' rights were squarely addressed in *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Federal pretrial detainees had challenged a number of jail policies, including a ban on hardback books from any source other than a publisher, book club, or bookstore. *Id.* at 528, 99 S.Ct. at 1868. The Court declared that detainees enjoy at least those constitutional rights that convicted prisoners retain, and held that detainees could be subjected "to the restrictions and conditions of the detention facility so long as those conditions and restrictions do not amount to punishment or otherwise violate the Constitution." *Id.* at 536–37, 545, 99 S.Ct. at 1872–73, 1877. Punishment may be inferred, the Court continued, if a policy "is not reasonably related to a legitimate goal—if it is arbitrary or purposeless...." *Id.* at 539, 99 S.Ct. at 1874. Yet absent evidence that a regulation represents an exaggerated response to a government concern, it should be upheld. *Id.* at 548, 99 S.Ct. at 1879.

The so-called publishers-only hardcover book rule in *Bell* was reasonably related to

prison security concerns, the Court concluded. *Id.* at 551, 99 S.Ct. at 1880. Informing this holding were these factors: the rule was content-neutral; the availability of softcover books, of hardback books from permitted sources, and of a large library afforded detainees sufficient options for acquiring reading material; and since the detainees were confined no more than sixty days, the rule had a limited impact on them. *Id.* at 551–52, 99 S.Ct. at 1880–81.

Last term the Court assessed convicted prisoners' constitutional rights by a rational relation test like that applied to detainees in *Bell. Turner v. Safley*, — U.S. —, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). Answering the question it had sidestepped in *Martinez*, the Court wrote, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 2261. Prison officials could establish a regulation's reasonableness by proving that: (1) there is a rational connection between the policy and some legitimate, content-neutral governmental interest; (2) alternative avenues allow the prisoner to exercise the right; (3) accommodation of the prisoner's request does not impact significantly on prison resources, prison guards, or other inmates; and (4) no obvious, easy alternatives to the regulation exist. *Id.* at 2262.

Applying this four-factor analysis, the Court in *Turner* held that limiting correspondence between plaintiff inmates and those at other prisons was logically connected to prevention of criminal activity by mail; thus the content-neutral ban survived constitutional scrutiny. *Id.* at 2263–64. But the same prison officials failed to prove any rational link between a restriction on inmate marriages and legitimate security and rehabilitation concerns. *Id.* at 2266.

The Court's opinions in *Turner* and *Bell* indicate that reasonableness is the preferred standard for evaluating prison restrictions. *Cf. O'Lone v. Estate of Shabazz*, — U.S. —, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) (reaffirming *Turner*

analysis in upholding restraint on inmates' free exercise of religion). But the American Booksellers Association would have us apply *Martinez'* heightened scrutiny to the ban on hardbound books alleged here, reasoning that it restricts the first amendment rights of nonprisoners as well as detainees. The Court in *Turner* considered a similar argument but did not resolve it, since the marriage regulation failed even a reasonableness analysis. *Turner*, 107 S.Ct. at 2266. Similarly, we do not reach the question here because we agree with plaintiff that the hardback book ban cannot pass the reasonable relation test.

■ The jail's General Order 17.1 states that detainees have a "right of access to any reading material except pornography as defined by the courts or reading matter which might pose an imminent threat to jail security." Plaintiff's Motion for Partial Summary Judgment [Plf.Mot.], Ex. C at 553. In keeping with this declaration, General Order 14.9 permits detainees to receive up to three softcover publications per mailing, as well as "[h]ard cover books from publishers if suitable for inspection; hard cover books from any source other than the publishers may be accepted at the discretion of the Superintendent." *Id.*, Ex. C at 460.

Yet defendants admit that contrary to these orders, the actual "policy of all superintendents has been to prohibit all hardcover books from any source." *Id.*, Ex. J [Answer 1 to First Set of Interrogatories]. This actual practice has been in effect about seventeen years. Addendum to Plaintiff's Reply Brief, Ex. DD at 43–44. *See also* Plf.Mot., Ex. A ¶ 27. Nor may detainees keep hardbacks in their cells. Plf.Mot., Ex. B ¶ 12, Ex. J–2 [Supplemental Answer 2 to Plaintiff's Interrogatories].

Plaintiff alleges in an affidavit that he was denied books sent to him by Alcoholics Anonymous, the Church of God Evangel, Barnes & Noble, and Pathway Books. Plf. Mot., Ex. D [Jackson aff.] ¶¶ 3–7. He offers letters from senders further demonstrating that some books were sent and rejected. Jackson aff., Exs. 1–12. Defendants initially denied the charge regarding

Alcoholics Anonymous, but eventually stated they had insufficient information regarding any alleged rejection. *Compare* Plf.Mot., Ex. A ¶ 16 *with* Plf.Mem. Ex. B. In any event, defendants have offered no proof controverting any of the rejections plaintiff alleges.

The detainees in *Bell* were incarcerated no more than sixty days. Plaintiff in this case spent 959 days in pretrial detention. Jackson aff., ¶¶ 8–9. During that time, plaintiff had no alternative means of obtaining the information he sought. Most of the books were published only in hard cover. Appendix to Plaintiff's Reply Memorandum [Plf. Reply App.], Ex. N. Few if any were available through the jail's library service. Jackson aff. ¶ 11; *see* Plf. Reply App., Ex. N. Defendants at first denied the latter assertion, but later admitted they had no listing of the library books available. *Compare* Plf.Mot., Ex. A ¶¶ 43, 46 *with* Plf.Mem., Ex. B at 11. Therefore, the denial of books to plaintiff encroached upon his first amendment right to receive information and the senders' right to convey that information to him.

To justify these infringements, defendants offer one document, an affidavit from defendant Glotz, the jail's security head since 1980. Def.Mem., Ex. B [Glotz aff.]. Glotz demonstrates that the jail's population of up to 5,560 inmates is extremely transient, requiring "strict security measures to ensure that contraband drugs and weapons do not enter the facility." *Id.* ¶¶ 4–9. Hardcover books present a security problem, Glotz states, because they may be hollowed out to hide contraband. Unlike soft covers, hard covers comprise layers of paper and cloth, making inspection for concealed drugs more difficult both in the mailroom and in cells. *Id.* ¶¶ 11–12. Hardbound books also may be used as bludgeons or as handles for blades. *Id.* ¶ 13. For all these reasons, Glotz states, he has "recommended that the prohibition against hardcover books be retained as a security measure reasonably related to legitimate security concerns and to ensuring the presence of pretrial detainees at trial." [1] *Id.* ¶ 3.

Glotz' affidavit is flawed. Nowhere does it describe specific incidents where hardback books were used in any manner posing a security risk. Furthermore, Glotz' own deposition contradicts several assertions in his affidavit. For instance, Glotz admits in his deposition that it is as difficult to detect contraband in clothing and other items as it is in hardcover books. Yet detainees may receive those other items through the mail and keep them in their cells. Plf. Reply App., Ex. X [Glotz dep.] at 8–9. Contraband has been secreted in items other than hardback books: in paperbacks (which detainees may receive through the mail) and in mattresses, light fixtures, and ceilings in cells. *Id.* at 16–17. Similarly, many items permitted in cells—bed pieces, soda pop containers, food trays, rolled-up magazines, game boards, and shoes, for example—have been used as bludgeons. *Id.* at 18–23. Though deprived of hard covers, detainees manage to fashion knife handles out of wrapped cloth and melted toothbrushes or ballpoint pens. *Id.* at 24–25. By admitting in effect that hardcover books pose no greater a security risk than many other items that detainees may receive in the mail and may keep in their cells, Glotz disproves defendants' assertion of a rational connection between their hardcover book ban and a governmental interest.

Even assuming that hard covers pose some security risk, plaintiff establishes an obvious, easy alternative to rejecting a book on this ground. The covers easily can be removed at the mailroom.

In sum, defendants fail to demonstrate a reasonable relationship between their blanket ban on hardback books, or their rejection of books from reputable suppliers, and any legitimate jail interest. The practices represent an exaggerated response to a minimal security risk; thus they violate the Constitution.

---

1. Because Glotz offers no factual basis for linking the hardback book ban to presence in court, we shall not consider that justification further.

We turn to plaintiff's second ground for partial summary judgment: his claim that when jail officials rejected books (both hardbound and softcover) mailed to him and returned them to the senders, they did not notify him of this rejection. In *Martinez*, the Supreme Court stated that procedural safeguards such as written notice to the inmate and an opportunity to be heard should accompany jail officials' decision to withhold mail from the inmate. *Martinez*, 416 U.S. at 417, 94 S.Ct. at 1814. *See also Gaines v. Lane*, 790 F.2d 1299, 1305 (7th Cir.1986); *Aikens v. Jenkins*, 534 F.2d 751, 757 (7th Cir.1976). Policies denying such minimal due process ought to withstand review under at least the reasonableness standard of *Turner* and *Bell*.

■ While plaintiff was confined, defendants admit, jail policies and procedures did not instruct staff to give detainees oral or written notice when publications sent to them were rejected. Plf.Mot., Ex. A–2 ¶ 33. And plaintiff offers proof that specific books were mailed to him, received by the jail, and returned to the senders without notification to him. *E.g.*, Jackson aff. ¶ 10 & Exs. 1–12; Plf. Reply App., Ex. W. He thus learned that books had been rejected only when senders told him—hardly a reliable alternative means of obtaining the information.

Defendants' sole evidentiary offer on this issue is the following paragraph in Glotz' affidavit:

> Due to the burden of processing mail for a population of 5,560 inmates, which gains and loses approximately 1,400 inmates per week, the Department of Corrections notifies only the sender of the contraband hardcover that it is being rejected for security reasons. Regulations requiring inmate notification and a hearing such as those suggested by the Plaintiff would serve no useful purpose, since it is the form, not the content, of the reading material that poses a danger to the institution. The form is not capable of interpretation, as the content may be.

> Though hearings on the contents of a book may serve a legitimate and useful purpose, a hearing cannot change the physical properties of the book as a potential smuggling device or weapon.

Glotz aff. ¶ 16.

Glotz cannot rely on the jail's universal ban on hardback books to justify the non-notification policy. Our holding that the ban is unconstitutional means jail officials must permit detainees to receive those books that present no real security risk. It follows that detainees should receive notification of rejections and be given an opportunity to object. Contrary to Glotz' assertion, such a procedure would be useful, for it would help ensure that jail officials reject books only for constitutionally permissible reasons.

Although Glotz warns of a burden on prison resources, he does not demonstrate a rational connection between that legitimate interest and a notice requirement. Mailroom personnel need do nothing more than photocopy or otherwise duplicate the notices of rejection already prepared for the books' senders. Distribution should not present a problem either, since jail staff already inspect and deliver inmates' mail. These are obvious, easy alternatives to the restriction on plaintiff's due process rights that defendants' non-notification policy represents. Thus we hold that the current policy also violates the Constitution.

■ Plaintiff contends that Sheriff Elrod, corrections head Hardiman, security chief Glotz, and division superintendents Blanks and Sullivan should be held liable for making and administering these policies.[2] Defendants properly concede liability for Hardiman, Glotz, Blanks, and Sullivan. *See* Plf.Mot. ¶¶ 27–30 and exhibits cited therein. As to Elrod, however, defendants state:

> As the Sheriff of Cook County, Richard Elrod was empowered to operate and have jurisdiction over the County Department of Corrections, and to appoint an Executive Director to act as the Chief

---

**2.** Elrod, Hardiman, and Glotz may be held liable in this action only in their official capacities. Blanks and Sullivan are sued in both their official and their personal capacities. *See Jackson,* 655 F.Supp. at 1134–36.

Executive and Administrate Officer of the Department. The Sheriff authorized the written policies and procedures as they appear in General Orders, after they have been submitted to the Executive Director for review and editing. The policies and practices themselves are the product of the Executive Director, the Superintendents, the Director of Security.... [T]he Sheriff had no personal input into the policies....

Def.Mem., Ex. G [Answer to Second Interrogatory 5]. Plaintiff counters this argument by pointing to evidence regarding development and promulgation of the General Orders. Plf.Mot. ¶¶ 27–30 and exhibits cited therein. Plaintiff thus proves that Elrod authorized written policies. But the hardback book ban deviated from written policy, and the non-notification policy was not embodied in any written order. Plaintiff has not shown that Elrod was involved in enforcement of unwritten practices; therefore, we deny him summary judgment on this point. Plaintiff will have to prove Elrod's liability, if he can, at trial.

### ORDER

Plaintiff's motion for partial summary judgment on liability for the hardbound book ban and the non-notification policy is granted as to defendants Hardiman, Glotz, Blanks, and Sullivan, and denied as to defendant Elrod.

### ON MOTION TO MODIFY

Plaintiff Robert Jackson moves to modify *Jackson v. Elrod,* 671 F.Supp. 1508, No. 86 C 1817, mem. op. (N.D.Ill. Oct. 14, 1987), in which we granted him partial summary judgment on two issues in this action. Specifically, Jackson objects to this sentence suggesting how defendant Cook County Jail officials might deliver the contents of hardback books to detainees without allegedly dangerous hard covers: "The covers easily can be removed either at the mailroom or, if that indeed takes too much time, see Glotz dep. at 42, by the sender before mailing." *Id.* at 1511. Jackson asks that we substitute the following sentence: "The covers

easily can be removed at the mailroom." Plaintiffs's Motion to Modify.

Our assumption that requiring mailroom personnel to tear off the hard covers would be burdensome was based on the following deposition exchange between Jackson's attorney and defendant Robert Glotz, the jail's security head:

Q I believe your testimony was that hardcover books can't be destroyed without destroying the book?

A The cover.

Q Without destroying the cover. Why can't the covers be returned to their original condition after they've been inspected?

A I don't know how that was possible after tearing off the inner liner or removing the inner liner. Plus, I really—my people really don't have the time to do that.

Plaintiff's Reply Memorandum, Ex. X at 42. Upon rereading, we agree with Jackson that Glotz said restoring the books would be too time-consuming, not that tearing them apart would create a burden. Defendants thus have offered nothing to controvert plaintiff's evidence that dismantling hardbacks does not present a problem. *See* Appendix to Plaintiff's Reply Memorandum, Exs. O, S, Y.

Now, however, defendants contend that their concern is not the time it would take to tear off covers but rather "the possibility of a multitude of claims of destruction of property." Defendants' Response to Plaintiff's Motion to Modify at 1. It is this concern upon which Glotz' statement is based, they argue, and propose we alter the sentence to reflect their contention. *Id.* at 2.

Glotz' deposition comment cannot support the meaning that defendants would attach to it, and defendants submit no other evidence that property-loss claims would ensue. Furthermore, Jackson's counterargument—that it would be easier for defendants to implement a contingent cover-dismantling policy than for detainees to have covers torn off before shipping—is persuasive. *See* Plaintiff's Reply Brief at 1–2 & n. 1.

## ORDER

Plaintiff's motion to modify is granted. [Editor's Note: The modification of the text of the memorandum opinion ordered by the Court has been made.]