882 F.2d 371
 132 L.R.R.M. (BNA) 2194, 58 USLW 2147,
113 Lab.Cas. P 11,695,
11 Employee Benefits Ca 1420
 BRITISH MOTOR CAR DISTRIBUTORS, LTD.; San Francisco
Autocenter; Van Ness Auto Plaza, Inc.; Golden
Gate Motors, Inc.; and European Motors,
Ltd., Plaintiffs-Appellants,
v.
SAN FRANCISCO AUTOMOTIVE INDUSTRIES WELFARE FUND, a trust
fund, Defendant-Appellee.
 No. 88-15192.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted June 26, 1989.
Decided Aug. 9, 1989.
 
 Robert G. Hulteng and Jonathan D. Rosenfeld, Littler, Mendelson, Fastiff & Tichy, San Francisco, Cal., for plaintiffs-appellants.
 Kenneth N. Silbert and Geoffrey Piller, Beeson, Tayer, Silbert, Bodine & Livingston, San Francisco, Cal., for defendant-appellee.
 Jeffrey H. Saltzman, Saltzman & Johnson, San Francisco, Cal., for intervenors-appellees.
 Appeal from the United States District Court for the Northern District of California.
 Before BROWNING, PREGERSON and THOMPSON, Circuit Judges.
 PREGERSON, Circuit Judge:
 
 
 1
 Plaintiff-Appellants British Motor Car Distributors, Ltd. and other automotive dealers (the "Employers") appeal the district court's grant of summary judgment in favor of defendant-appellee San Francisco Automotive Industries Welfare Fund (the "Trust") and intervenors-appellees Automotive Industries Welfare Trust, Northern California Motor Car Dealers Association Insurance Trust, and Bay Area Automotive Group Welfare Trust (the "Successor Trusts"). The Employers contend that the district court improperly interpreted section 403(c)(2)(A)(ii) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. Sec. 1103(c)(2)(A)(ii) (1982), and section 302 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. Sec. 186 (1982). For the reasons stated below, we affirm the district court's grant of summary judgment in favor of the Trust.
 
 BACKGROUND
 
 2
 The Trust was established in 1955 pursuant to collective bargaining agreements between a group of San Francisco automobile dealerships (i.e., the plaintiffs-appellants Employers) and several local unions. The Trust was designed to provide health and welfare benefits to employees of the dealerships. Under the Trust Agreement and the collective bargaining agreements, the Employers were required to make monthly contributions to the Trust to provide health care benefits for employees.[1] A Board of Trustees, half of whom were appointed by the employers and half by the unions, administered the Trust. The 1976 amendments to the Trust Agreement explicitly incorporated ERISA.
 
 
 3
 On November 1, 1981, the Trustees cancelled coverage with Occidental Life Insurance Company of California and retained Union Labor Life as the Trust's insurer. Union Labor Life served as the Trust's insurer until October 31, 1983. At that time, the Trust ceased operations because the collective bargaining agreements expired and were not renewed. All of the Trust's participants (i.e., employees and other designated beneficiaries) were transferred to one of the three Successor Trusts. At the time of the transfer, the three Successor Trusts were well-funded, financially secure plans. Thereafter, the Trust received two unexpected refunds from Union Labor Life: $383,425 in June 1984, and $400,377 in October 1985. After the Trust ceased operating and all claims against the Trust were paid or provided for, the Board decided to transfer the remaining Trust assets to the Successor Trusts. At the time of the transfer, these assets, including the two refunds and accrued interest, totalled approximately $950,000.
 
 
 4
 The Trustees, however, could not agree on what restrictions, if any, should be placed upon use of these funds by the Successor Trusts. The union-appointed trustees favored a transfer without restrictions while the employer-appointed trustees urged that the Successor Trusts be required to earmark the transferred funds for the benefit of former Trust employers as offsets from future contributions. After the Trustees deadlocked on a motion to transfer the funds to the Successor Trusts without restrictions, the matter was referred to arbitration pursuant to Article IV of the Trust Agreement. The Trustees were unable to agree upon an arbitrator. The union-appointed trustees then brought suit in federal district court,[2] requesting appointment of an arbitrator. In October 1986, the district court selected Walter Slater as arbitrator.
 
 
 5
 The Employers filed this lawsuit on February 26, 1987, seeking to recover the funds that remained in the Trust after all claims against the Trust had been paid. These were the funds that the Trustees agreed to transfer to the Successor Trusts. Meanwhile, an arbitration hearing was held on August 25, 1987. On November 23, 1987, Arbitrator Slater ruled that the funds were to be transferred without any restrictions to the Successor Trusts. The district court subsequently granted summary judgment in favor of the Trust (and the intervenors) on July 19, 1988.
 
 STANDARD OF REVIEW
 
 6
 We review the district court's grant of summary judgment de novo. Pilon v. Retirement Plan for Salaried Employees, 861 F.2d 217, 218 (9th Cir.1988). To withstand summary judgment, the non-moving party (1) must make a showing sufficient to establish a genuine issue of fact with respect to any element for which it bears the burden of proof; (2) must show that there is an issue that may reasonably be resolved in favor of either party; and (3) must come forward with more persuasive evidence than would otherwise be necessary when the factual context makes the non-moving party's claim implausible. California Arch. Bldg. Prod. v. Franciscan Ceramics, Inc., 818 F.2d 1466, 1468 (9th Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988).
 
 ANALYSIS
 I. Restitution of Contributions
 A. Employers' ERISA Claim
 
 7
 The Employers contend that under section 403(c)(2)(A)(ii) of ERISA, 29 U.S.C. Sec. 1103(c)(2)(A)(ii), they are entitled to the Trust's surplus assets. They argue that the district court erred in denying their summary judgment motion because, as a matter of law, the record indicates that the Trust's surplus assets are the direct result of actuarial errors and that such errors constitute a "mistake of fact" within the meaning of section 403(c)(2)(A)(ii). They argue in the alternative that summary judgment in favor of the Trust was improper because there is a genuine issue of material fact concerning whether some of their contributions to the Trust resulted from a mistake of fact.
 
 
 8
 Section 403(c) of ERISA provides in pertinent part:
 
 
 9
 (1) Except as provided in paragraph (2) ... the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.
 
 
 10
 (2)(A) In the case of a contribution ...
 
 
 11
 (ii) made by an employer to a multiemployer plan by a mistake of fact or law ... paragraph (1) shall not prohibit the return of such contribution or payment to the employer within 6 months after the plan administrator determines that the contribution was made by such a mistake.[3]
 
 
 12
 (Emphasis added). Thus, ERISA provides for the return of contributions that an employer made to a multiemployer plan because of a mistake of fact. Moreover, this court has concluded that an employer has an implied right of action under section 403 to recover mistaken contributions. See Award Serv., Inc. v. Northern Cal. Retail Clerks Unions, 763 F.2d 1066, 1068 (9th Cir.1985), cert. denied, 474 U.S. 1081, 106 S.Ct. 850, 88 L.Ed.2d 890 (1986). However, a showing of mistake of fact will not automatically result in a refund to the employer. After demonstrating that contributions resulted from a mistake, the employer must establish that the equities favor restitution. Id. at 1069.
 
 
 13
 Accordingly, if the Employers can establish that they made mistaken contributions within the meaning of section 403(c)(2)(A)(ii) and that the equities favor a refund of these contributions, the Employers would be entitled to a refund.[4] Alternatively, if the Employers can show that there is a genuine dispute concerning whether their contributions were mistaken, then the district court erred in granting summary judgment in favor of the Trust.
 
 
 14
 The key issue is whether the type of mistake alleged by the Employers constitutes a "mistake of fact" within the meaning of section 403(c). The Employers actually allege several mistakes of fact by Trust fiduciaries, in the form of over-charges on their monthly premiums. They point out that they were required by the collective bargaining agreements to maintain employee health care benefits. From this, the Employers conclude that the fact that the Trust terminated (having paid off all beneficiary claims) with surplus assets of approximately $950,000 proves that the Trust fiduciaries' actuarial projections were mistaken. And as a result of that mistake, the Employers paid premiums in excess of what was actually required to maintain employee benefits.
 
 
 15
 The Employers cite several cases to support their argument that errors in actuarial projections by plan fiduciaries constitute a mistake of fact within the meaning of section 403(c)(2)(A)(ii). These cases, however, provide no support for the Employers' position because they involve arithmetical or clerical errors made by the employer/contributor, not decisions involving actuarial projections by plan fiduciaries. See Award Service, 763 F.2d at 1067 (employer/contributor through clerical error made contributions even though it was not a party to the collective bargaining agreement); Service Employees v. Baucom Janitorial Serv., Inc., 504 F.Supp. 197, 198 (D.D.C.1980) (finding a section 403(c) mistake of fact because employer/contributor miscalculated the amount of productive hours and as a result made excessive contributions); Central States v. Wholesale Produce Supply, 478 F.Supp. 884 (D.Minn.), aff'd, 611 F.2d 694 (8th Cir.1979) (finding mistake of fact where employer/contributor made contributions on behalf of an ineligible employee due to a clerical error).[5] The one case the Employers rely on that involves a refund for actuarial error, International Union, United Auto. v. Dyneer Corp., 747 F.2d 335 (6th Cir.1984) is easily distinguished from this case for several reasons. Dyneer involved a single-employer plan. Therefore, the court interpreted and applied 29 U.S.C. Sec. 1344(d)(1) (1982),[6] an exception to the general rule of section 403(c)(1) that plan assets shall never inure to the benefit of any employer. The section 1344(d)(1) exception does not apply to multi-employer plans. Furthermore, this exception does not apply where, as here, the Trust Agreement does not explicitly provide that the employer was entitled to a refund in the event of an actuarial error. Id. at 337. Thus, the caselaw itself does not provide authority for the proposition that an allegation of actuarial error gives rises to a cause of action for mistaken contributions under section 403(c)(2)(A)(ii).
 
 
 16
 There are, moreover, compelling reasons to support the proposition that, as a matter of law, an alleged actuarial error on the part of plan fiduciaries does not fall within the section 403(c)(2)(A)(ii) mistake of fact exception to the general rule of section 403(c)(1) that "assets of a plan shall never inure to the benefit of any employer...."
 
 
 17
 The actuarial errors alleged by the Employers in the instant case, unlike the clerical or arithmetical mistakes made by employers/contributors in the cases discussed above, go to the decision-making process required of plan fiduciaries in carrying out their duties under ERISA and the Trust Agreement. ERISA regulates the actuarial assumptions and methods applied by plan fiduciaries. See 29 U.S.C. Sec. 1082(c)(3) (1982) (requiring the adoption of "reasonable actuarial assumptions and methods" in determining costs and liabilities under an ERISA plan). Additionally, Article V of the Trust Agreement requires the trustees to administer the insurance policies that provide employee benefits.[7] Thus, the decisional process required to make actuarial projections, as an essential element in determining monthly premium rates, falls within the statutorily and contractually required duties of the Trustees. Accordingly, the Trustees' decisions made in carrying out these duties are subject only to the highly deferential arbitrary and capricious test applicable when fiduciary decisions are challenged under ERISA. See, e.g., Elser v. I.A.M. Nat'l Pension Fund, 684 F.2d 648, 654 (9th Cir.1982), cert. denied, 464 U.S. 813, 104 S.Ct. 67, 78 L.Ed.2d 82 (1983).
 
 
 18
 Actuarial projections involve making estimates about future claims. Because future claim levels are a function of numerous contingencies, and plan fiduciaries are required under ERISA to ensure that their plan has the assets to cover future claims, it is not uncommon that actuarial projections will produce surplus assets. If employers could challenge fiduciaries' actuarial decisions that result in a fund surplus as alleged mistakes of fact under section 403(c)(2)(A)(ii), then conceivably every decision of plan fiduciaries having financial consequences (and thereby affecting premium rates) would be subjected to attack as a section 403(c) mistake of fact. This would be inconsistent with the broader statutory scheme of ERISA because plan fiduciaries act within the scope of their statutorily-assigned duty when they adopt any "reasonable" set of assumptions and methods.
 
 
 19
 Moreover, there is nothing in the language of section 403(c)(2)(A)(ii) or its legislative history to suggest that Congress intended by this provision to deviate from the general ERISA rule of deference to fiduciary decision-making and allow courts to substitute their judgments for the judgments of fiduciaries on decisions involving actuarial rates. The way in which this section is framed--requiring a plan administrator's determination that a mistake has been made[8]--evidences Congressional intent to defer to the decisions of plan administrators in a manner consistent with ERISA's general deference to them when they act within the scope of their duties.
 
 
 20
 The sparse legislative history of section 403(c)(2)(A)(ii) is consistent with this reading. The 1974 legislative history states: "An employer's contributions can be returned ... if made as a mistake of fact. (For example, an employer may have made an arithmetical error in calculating the amounts that were to be contributed to the plan.)" Conference Rep., H.R.Rep. No. 1280, 93d Cong., 2d Sess. 303, reprinted in 1974 U.S.Code Cong. & Admin.News 5038, 5083.[9] Although the example is certainly not meant to be exhaustive, there is nothing in the legislative history supporting the view that a fiduciary's actuarial projection could be a mistake of fact for purposes of section 403(c)(2)(A)(ii).
 
 
 21
 Because we conclude that an actuarial projection cannot constitute a mistake of fact under section 403(c)(2)(A)(ii), we affirm the district court's grant of summary judgment with regard to the Employers' ERISA claim on the ground that their allegation of actuarial error does not state a claim under ERISA.
 
 B. Employers' Federal Common Law Claim
 
 22
 The Employers contend that even if relief is not available under section 403(c)(2)(A)(ii), they are entitled to a refund under the federal common law of restitution. They cite several cases from other circuits for the theory that Congress, in enacting ERISA, authorized the evolution of a federal common law of pension plans and such authorization gives courts the power to order restitution in favor of employers to prevent unjust enrichment.
 
 
 23
 The Employers' contention is meritless. They cite two circuit cases which they contend stand for the proposition that there is a federal common law cause of action for restitution for mistaken contributions by employers distinct from an action pursuant to section 403(c)(2)(A)(ii). Whitworth Bros. Storage Co. v. Cent. States, 794 F.2d 221, 236 (6th Cir.), cert. denied, 479 U.S. 1007, 107 S.Ct. 645, 93 L.Ed.2d 701 (1986); Airco Indus. Gases v. Teamsters Health & Welfare, 618 F.Supp. 943, 950 (D.Del.1985). In both cases, however, the court first held that an employer had no implied right of action under section 403(c)(2)(A)(ii) and only then held that an employer had a right of action under federal common law.
 
 
 24
 There is nothing in these opinions to indicate that such a cause of action has substantive elements distinct from a section 403(c)(2)(A)(ii). Therefore, even if we were to recognize a federal common law cause of action for restitution of mistaken contributions to an ERISA plan, the Employers would still be required to allege a section 403(c)(2)(A)(ii) mistake of fact. And because we have concluded that the Employers have not alleged such a mistake of fact, it follows that they have not alleged a mistake of fact for purposes of the federal common law cause of action.
 
 
 25
 Moreover, this court has not recognized any such federal common law action for restitution in favor of employers. And there would appear to be no basis for such an action particularly where this court does allow employers to bring suit under ERISA for restitution of mistaken contributions.
 
 II. Transfer of Funds to Successor Trusts
 
 26
 The Employers challenge the transfer of the Trust's remaining assets to the Successor Trusts as a violation of section 302 of the LMRA, 29 U.S.C. Sec. 186. As an alternative to a refund of remaining assets, the Employers propose that the assets be held in trust and disbursed to them as needed to provide health benefits to their employees.
 
 
 27
 Section 302 of the LMRA provides in pertinent part:
 
 
 28
 (a) It shall be unlawful for any employer ... to pay, or agree to pay, ... any money or other thing of value--
 
 
 29
 (1) to any representative of any of his employees who are employed in an industry affecting commerce; ....
 
 
 30
 (c) The provisions of this section shall not be applicable ... (5) with respect to money or other thing of value paid to a trust fund established by such representative, for the sole and exclusive benefit of the employees of such employer, and their families and dependents (or of such employees, families, and dependents jointly with the employees of other employers making similar payments, and their families and dependents)....
 
 
 31
 (Emphasis added.) Thus, the exception in section 302(c)(5) to the general prohibition of section 302(a) against employers' payments to employees' representatives requires that such payments be for the "sole and exclusive benefit" of the employees.
 
 
 32
 The Employers contend that the transfer of Trust funds to the Successor Trusts without any restrictions was not for the sole and exclusive benefit of the Trust participants. They argue that because the Successor Trusts are multiemployer trust funds involving employers and employees who never took part in the Trust, the funds will benefit employees other than those who participated in the Trust.[10] The Employers conclude that because the transfer of funds violates section 302 of the LMRA, the arbitrator erred on a question of law and his ruling should be reversed.[11]
 
 
 33
 The Employers' argument proves too much. Subsection 302(c)(5), quoted above, specifically authorizes payments to multiemployer trust funds. In any such pooled fund, depending on the empirically contingent pattern of employee health and sickness, one employer's employees may never need to file a claim and this employer's payments may be used wholly to pay for claims made by a different employer's employees. Because any multiemployer trust fund might result in one employer's payments covering the claims of another employer's employees, the Employers' argument leads inexorably to the conclusion that all multiemployer trust funds violate the "sole and exclusive benefit" rule of subsection 302(c)(5). This conclusion, directly contradicting subsection 302(c)(5)'s explicit authorization of multiemployer trust funds, is untenable.
 
 
 34
 Moreover, Congress enacted section 302's prohibition against employers' payments to employees' representatives to combat specific evils: to wit, bribery of union officials by employers, extortion of employers by union officials, and potential abuse by union officials if they were given control of welfare funds. See Arroyo v. United States, 359 U.S. 419, 425-26, 79 S.Ct. 864, 868-69, 3 L.Ed.2d 915 (1959). Certainly there is no trace of any such evil in the transfer at issue in the instant case.
 
 
 35
 Finally, the Employers cite no authority for the proposition that a transfer of trust funds to a successor trust that has some employee beneficiaries who did not participate in the original trust violates the "sole and exclusive benefit" rule. The one case the Employers cite, In re Typo-Publishers Outside Tape Fund, 478 F.2d 374 (2d Cir.), cert. denied, 414 U.S. 1002, 94 S.Ct. 357, 38 L.Ed.2d 238 (1973), is not on point. There, trustees of the fund proposed that fund assets be used to benefit employees whose employers did not contribute to the fund. See In re Typo-Publishers Outside Tape Fund, 344 F.Supp. 194, 195 (S.D.N.Y.1972), aff'd, 478 F.2d 374 (2d Cir.), cert. denied, 414 U.S. 1002, 94 S.Ct. 357, 38 L.Ed.2d 238 (1973). In the instant case, the participation of each and every employee in the Successor Trusts is subsidized by his or her employer's contributions. Thus, even before the remaining Trust assets were transferred to the Successor Trusts, the Successor Trusts were financially stable plans with ample reserve assets. Therefore, unlike the In re Typo-Publishers employees who were not subsidized by their respective employers, the employees in the instant case who were not participants in the original Trust are not "free-riding" on the contributions of the original Trust employers. This is so because their employers had been making contributions on their behalf to the Successor Trusts.
 
 
 36
 For these reasons, we conclude that the arbitrator did not err on a question of law in deciding that the Trust's remaining assets should be transferred without restrictions to the Successor Trusts.
 
 
 37
 AFFIRMED.
 
 
 
 [1]
 Each of the four collective bargaining agreements contained a maintenance of benefits clause. The language employed in these clauses varied from agreement to agreement but each clause required the employer to make contributions sufficient to pay for the employees' benefits and any related administrative costs
 
 
 [2]
 Powell v. Fontana, No. 86-3723 (N.D.Cal.)
 
 
 [3]
 Section 403(c)(2)(A)(ii) provides that a refund of an employer's mistaken contribution is not prohibited within six months of the date that a plan administrator determines that the contribution was made by mistake. Thus, it would appear that no refund can be made under this section without a determination by a plan administrator that a mistake has occurred. We have stated, however, that a trust fund cannot escape its responsibilities under ERISA by denying that a mistake has been made. Chase v. Trustees of Western Conference of Teamsters Pension Trust Fund, 753 F.2d 744, 752 (9th Cir.1985)
 
 
 [4]
 Because we hold that the Employers fail to establish that they made mistaken contributions within the meaning of section 403(c)(2)(A)(ii), see infra at 377, we do not reach the equities
 
 
 [5]
 The Employers also cite Airco Indus. Gases v. Teamsters Health & Welfare, 618 F.Supp. 943 (D.Del.1985). In this case, the employer/contributor erroneously made contributions on behalf of ineligible employees. The court held that there was no implied right of action in favor of employers under section 403 but denied the union pension fund's motion for summary judgment on the ground that there is a cause of action under the federal common law for unjust enrichment to recover mistaken contributions. See infra "Employers' Federal Common Law Claim" at 13
 
 
 [6]
 29 U.S.C. Sec. 1344(d)(1) provides in pertinent part:
 [A]ny residual assets of a single-employer plan may be distributed to the employer if--
 (A) all liabilities of the plan to participants and their beneficiaries have been satisfied,
 (B) the distribution does not contravene any provision of law, and
 (C) the plan provides for such a distribution in these circumstances.
 
 
 [7]
 The Trustees are also required to fix any administrative costs to be assessed against the Employers as part of their monthly premiums
 
 
 [8]
 See supra note 3
 
 
 [9]
 The legislative history of the Multiemployer Pension Plan Amendments Act of 1980, 126 Cong.Rec. 20 (1980), adds nothing by way of clarifying the meaning of "mistake of fact."
 
 
 [10]
 The Employers also argue that because some of the employees who participated in the Trust are not participating in any of the Successor Trusts, these employees will derive no benefits from the transfer of the Trust's funds. The Employers concede, however, that at the time of the transfer of funds, each of the former Trust participants was participating in one of the three Successor Trusts. Because the time of transfer is the relevant time for considering the propriety of the transfer, we reject this argument by the Employers
 
 
 [11]
 We reverse a decision by trustees only where the decision is " 'arbitrary, capricious or made in bad faith, not supported by substantial evidence, or erroneous on a question of law.' " Elser, 684 F.2d at 654 (quoting Rehmar v. Smith, 555 F.2d 1362, 1371 (9th Cir.1976)) (emphasis added). In the instant case, the Trust funds were transferred pursuant to an arbitrator's decision after the Trustees deadlocked on how to handle the surplus assets. Because the trustees, pursuant to the terms of the Trust Agreement, resorted to the arbitrator to resolve a matter within the scope of their fiduciary duties, the same standard of review should apply to the arbitrator's decision