Fletcher CASEY, Jr., et al., on behalf of themselves & all others similarly situated, Plaintiffs,

v.

Samuel A. LEWIS, Director, Arizona Department of Corrections, et al., Defendants.

No. CIV 90–0054–PHX–CAM.

United States District Court, D. Arizona.

Sept. 6, 1991.

Adjoa A. Aiyetoro, Stuart H. Adams, Jr., David C. Fathi, ACLU Nat. Prison Project, Washington, D.C., Alice L. Bendheim, Phoenix, Ariz., for plaintiff class.

Edward G. Hochuli, Kathleen L. Wieneke, Daniel P. Struck, Jones, Skelton & Hochuli, Phoenix, Ariz., for defendants.

## AMENDED MEMORANDUM AND ORDER

MUECKE, District Judge.

Having considered all the pleadings filed with respect to plaintiffs' motion for partial summary judgment and the oral argument presented to the Court on August 23, 1991, the Court concludes as follows:

### INTRODUCTION

This case was filed on January 12, 1990. On June 26, 1990, this Court certified a class composed of all adult persons who are now or who in the future will be in the custody of or under the supervision of the Arizona Department of Corrections ("ADOC"). The class also consists of a subclass of all prisoners who are handicapped and within the custody of the ADOC. Named plaintiffs are seeking declaratory and injunctive relief on behalf of the class, inclusive of the subclass.

Plaintiffs have filed a motion for partial summary judgment on the issues of contact attorney visitation and denial of prison jobs in violation of Section 504 of the Rehabilitation Act. Plaintiffs specifically request that the Court issue an Order prohibiting a

blanket prohibition against contact attorney visits and that defendants' policy of denying food service jobs to prisoners who test HIV positive be invalidated.

## DISCUSSION

### I. *Standard of Review*

■ A motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Federal Rules of Civil Procedure, Rule 56(c). The party seeking summary judgment bears the initial responsibility of showing the absence of a genuine issue for trial. *Celotex Corporation v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The moving party must provide to the court a statement of specific uncontroverted facts, separate from its motion for summary judgment, on which it bases its motion. District of Arizona, Local Rule 11(*l*)(1). The moving party need not present affidavits or other materials negating the opponent's claims, but need only inform the court of the basis of its motion and indicate those portions of the pleadings and any other evidentiary matter listed in Rule 56(c) that support its contention that no genuine issue of fact exists. *Celotex*, 477 U.S. at 323–324, 106 S.Ct. at 2553. The moving party must cite specifically the portion of the record where the court can find the particular facts supporting its motion. District of Arizona, Local Rule 11(*l*)(1).

■ To defeat the motion, the party opposing summary judgment must establish that a genuine issue of fact exists with respect to any element for which it bears the burden of proof at trial. *British Motor Car Distributors, Ltd. v. San Francisco Automotive Industries Welfare Fund*, 882 F.2d 371, 374 (9th Cir.1989). The opposing party may not merely rely on the assertions and allegations of the pleadings, but instead must set forth specific facts showing a genuine issue for trial. Federal Rules of Civil Procedure, Rule 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir.1989). Like the moving party, the party opposing the motion must direct the court's attention to where those facts appear in the pleadings, affidavits, and other evidentiary matter used to support the opposition; merely citing the record without designating where the fact is stated is not sufficiently specific. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2548; *see Nissho–Iwai American Corp. v. Kline*, 845 F.2d 1300, 1307 (5th Cir.1988). If the opposing party does not respond in the manner specified in Rule 56(e), summary judgment will be granted. Federal Rules of Civil Procedure, Rule 56(e).

### II. *Contact Attorney Visits*

On May 9, 1991, this Court preliminarily enjoined defendants from implementation of a policy that denied contact attorney visits between prisoners and their attorneys in Cellblock 6 ("CB6") of the Arizona State Prison in Florence. Plaintiffs' motion seeks to have this ruling applied to all the facilities that prohibit contact visits between prisoners and attorneys. These facilities include the Special Management Unit ("SMU"), CB6, the Alhambra Reception Center ("Alhambra"), and all facilities where prisoners are kept in lockdown status. Where it is necessary, the Court will deal with each unit individually.

■ An inmate is entitled to meaningful access to the courts under the fourteenth amendment. *See Bounds v. Smith*, 430 U.S. 817, 822, 97 S.Ct. 1491, 1495, 52 L.Ed.2d 72 (1977). A prisoner's right to access to the courts encompasses a right to contact attorney visits. *Ching v. Lewis*, 895 F.2d 608, 610 (9th Cir.1990).

■ Any infringement by prison administrators upon a prisoner's meaningful access to the courts must be reasonably related to legitimate penological interests. *Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987). *Turner* identifies four factors in evaluating the reasonableness of a prison regulation: 1)

There must be a valid, rational connection between the regulation and the legitimate governmental interest put forward to justify it; 2) Whether there are alternative means for the inmate to exercise his or her constitutional right; 3) What impact the exercise of the constitutional right will have on the guards and other inmates and on the allocation of prison resources generally; and 4) the absence of ready alternatives is evidence of the reasonableness of a prison regulation. 482 U.S. at 90, 107 S.Ct. at 2262.

### A. Whether there is a Rational Connection between the Prison Regulation and the Legitimate Governmental Interest put Forward to Justify it.

██ "[A] regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational." *Id.* at 89, 107 S.Ct. at 2262. In *Walker v. Sumner,* 917 F.2d 382 (9th Cir. 1990), the Ninth Circuit concluded that prison officials must provide evidence of the purpose of a regulation and how it furthers a legitimate penological interest. *See id.* at 388.

Defendants provided no proof of the regulation's purpose or how it furthers a legitimate penological objective. They offered no evidence that contact attorney visits resulted in escapes or assaults in any of the facilities.

In addition, as the Court noted with respect to CB6,

> the fact that defendants allow some CB6 prisoners to have contact visits with their families [1] undermines any conclusion that there is a rational connection between the regulations and any legitimate penological interest of preventing escapes and assaults. Defendants offered no evidence that attorneys, as officers of the Court, are more likely than family members to assist in escapes or be assaulted.

Indeed, the only evidence of an escape presented by defendants was perpetrated with the assistance of family members. Court's Order of May 9, 1991, at 5.

Similarly, with respect to SMU, the Court believes that there is no rational connection between the non-contact policy and a legitimate governmental interest. SMU is a high security lockdown unit that houses the most highly disruptive and violent inmates within the Department of Corrections. All visitation at SMU, including attorney visitation, is non-contact. Although the type of inmates housed at SMU and the fact that no contact visitation is allowed is persuasive, that still does not appear to be sufficient to implement a *blanket* denial of contact attorney visitation. The inmates housed in SMU, as plaintiffs' counsel noted in oral argument, are the same inmates that were housed in CB6 before the opening of SMU. With respect to CB6, there have been no escapes, assaults, or incidents whereby dangerous contraband entered the institution as a result of a contact attorney-client visit. Court's Order of May 9, 1991, at 2. Defendants did not provide any evidence to show that SMU inmates, as a group, posed a security risk such that the entire unit should be denied contact visits with their attorneys.[2] As this Court previously concluded, blanket denial of contact attorney visitation is constitutionally impermissible. *See* Court's Order of May 9, 1991, at 6.

██ Finally, defendants' assertion that inmates at Alhambra, who have not yet been classified and therefore must be considered a Level 5 (the highest risk), and not entitled to contact visits, must fail. A prisoner's classification (or non-classification as the matter may be) or housing assignment is not sufficient to deny the prisoner his or her fundamental right to contact attorney visits.

In short, the record in this case precludes the Court from determining whether defen-

---

**1.** Although family contact visits are allowed after a certain period of time, the fact that defendants' policy does not provide for a similar provision for attorneys suggests the arbitrariness of the policy.

**2.** This probably would be a rather difficult showing given that many of the SMU inmates were allowed contact visits, apparently without incident, when they were housed in CB6.

dants asserted justification—prevention of escapes and assaults—was the actual reason for implementing the non-contact visitation policy. Moreover, defendants have not established that there is a rational connection between the prison regulation and any legitimate governmental interest. They provided no evidence of the regulation's purpose or how it furthers a legitimate penological objective. They did not cite a single incident in which escapes and/or assaults occurred as a result of contact visitation between attorneys and prisoners. Plaintiffs' Statement of Facts ("SOF"), at para. 9 [3]; *Cf. Jackson v. Elrod,* 671 F.Supp. 1508 (N.D.Ill.1987) (court rejected affidavit because it did not cite a single incident in which hard-cover books, which were banned by prison, were used to convey contraband).

### B. Whether the Alternative Means of Exercising the Right are Inadequate.

According to defendants, the "alternative means for inmates to exercise their right to communicate with counsel include the mail, non-contact visitation and non-monitored telephone calls." Defendants' Response, at 11. While defendants' alternatives are adequate in many instances, there is no doubt that, in an equal number of instances, counsel need contact visits in order to assess a witness' demeanor and credibility. It is more difficult to assess a prisoner's demeanor while he or she is in, for example, a cage such as the one used in CB6. In addition, contact visits are necessary in order to establish a relationship between the attorney and his or her client. *Ching,* 895 F.2d at 610. Finally, since the Ninth Circuit recognizes contact visits as a part of the constitutional right to access to the courts, any alternative, except contact visits, is inadequate unless defendants make a showing that a particular inmate's right to contact visits must be abridged for valid penological reasons.

### C. Whether, and the Extent to which, Contact Visits will Impact Other Inmates, Prison Staff, or Prison Resources in General.

In their response, defendants present argument only with regard to SMU. They assert that "[t]he physical plant at SMU is not designed to accommodate contact visitation.... To allow the high risk inmates at SMU into this non-secure area would greatly increase the possibility of violence, escapes and/or hostage situations. Additionally, the staffing that would be required in order to conduct such contact visitation is not available at SMU." Defendants' Response, at 11.

Defendants' claim that contact visits at SMU would require the expenditure of additional resources is insufficient since the "cost of protecting a constitutional right cannot justify its total denial." *Bounds,* 430 U.S. at 825, 97 S.Ct. at 1496. Further, defendants have, with respect to SMU and all other units, provided virtually no evidence showing an adverse impact on prison resources generally from the provision of contact attorney visits. They provided no evidence to show that contact visits at SMU will have a significant impact on other inmates, guards, or prison resources. Without any evidence that contact visits will have a significant impact on prison resources, this Court is unwilling to abridge an inmate's constitutional right of access to the courts. Defendants cannot avoid their constitutional obligation to provide prisoners with contact attorney visits simply by asserting that the visitation area is non-secure.

### D. Whether there is an Absence of Ready Alternatives.

Defendants assert that non-contact visits "are not an exaggerated response due to the class of inmate housed in these facilities." Defendants' Response, at 12. However, the Court believes that defendants' current security measures are an obvious,

---

**3.** Defendants attempt to controvert this fact by stating:

> Defendants object to paragraph 9 of Plaintiffs' Statement of Facts for the reason that contra-

band may possibly have been introduced in this manner without their knowledge.

Defendants' Objections to Plaintiffs' Statement of Facts, at 2.

easy alternative to denying contact visits. These measures make escape or the introduction of dangerous contraband unlikely. For example, with respect to SMU, defendants search a prisoner both before and after a non-contact attorney visit. They also search attorneys and other legal visitors for contraband before they enter SMU for a legal visit. Plaintiffs' Statement of Facts ("SOF"), at para. 15. Defendants can observe both the attorney and the prisoner during a legal visit. *Id.* at para. 20. Similarly, with respect to CB–6, correctional officers can observe the entire visit. No assaults have occurred in the history of CB–6, and family contact visits are allowed in this unit. In short, DOC's search and observation procedures are sufficient to protect prisoners, attorneys and DOC staff. DOC's precautions are reasonable, and a blanket denial of contact visits, under the circumstances of this case, is an exaggerated response.

### III. *Assignment of HIV Positive Prisoners to Food Service Jobs*

 DOC policy prohibits the assignment of prisoners who test HIV positive to food service jobs. Defendants' SOF, at para. 15. According to defendants,

This practice was developed in response to situations where inmates had threatened physical harm to inmates who are HIV positive. Additionally, this practice began after a large riot occurred at ASPC–Douglas on March 7, 1987. [O]ne of the primary causes of the riot was inmate dissatisfaction with the reuse of plastic tableware that could have possibly been used by an inmate who was known by the general population to have AIDS.

Defendants' Motion, at 12–13.

Plaintiffs assert that defendants' policy of excluding HIV positive prisoners from food service jobs violates § 504 of the Rehabilitation Act, which provides as follows:

No otherwise qualified individual with handicaps ... shall, solely by reason of her or his handicap, be excluded from the participation in ... or be subjected to discrimination under any program or activity receiving Federal financial assistance ...

29 U.S.C. § 794. A handicapped person is any person who (1) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (2) has a record of such impairment, or (3) is regarded as having such an impairment. 29 U.S.C. § 706(7)(B). A person is "otherwise qualified" for purposes of § 504 if he or she

is able to meet all of a program's requirements in spite of his handicap. In the employment context, an otherwise qualified person is someone who can perform the essential functions of the job in question.

*School Board of Nassau County v. Arline*, 480 U.S. 273, 287 n. 17, 107 S.Ct. 1123, 1131 n. 17, 94 L.Ed.2d 307 (citations and internal quotations omitted). Section 504 applies to persons with contagious diseases. *Id.* at 289, 107 S.Ct. at 1132. The factors a court must consider in determining whether a contagious disease can be considered a handicap under Section 504 are:

(a) the nature of the risk (how the disease is transmitted), (b) the duration of the risk (how long is the carrier infectious), (c) the severity of the risk (what is the potential harm to third parties), and (d) the probabilities that the disease will be transmitted and will cause varying degrees of harm.

*Id.* at 288, 107 S.Ct. at 1131. Using these guidelines, courts have held that persons who are HIV positive are handicapped persons to whom § 504 applies. *See Chalk v. U.S. Dist. Court Cent. Dist. of California*, 840 F.2d 701 (9th Cir.1988); *Martinez v. School Board of Hillsborough County*, 861 F.2d 1502, 1506 (11th Cir.1988).

Although a significant risk of transmission of the AIDS virus could justify exclusion of the infected person from a job for which he or she is otherwise qualified, *Arline*, 480 U.S. at 287 n. 16, 107 S.Ct. at 1131 n. 16, the Ninth Circuit has found, based on reasonable medical judgments, that there is no significant risk of transmitting HIV disease except through "(1) inti-

mate sexual contact with an infected person; (2) invasive exposure to contaminated blood or certain other bodily fluids; or (3) perinatal exposure (i.e., from mother to infant)." *Chalk,* 840 F.2d at 706. Indeed, the Ninth Circuit cited the conclusions of the Surgeon General of the United States that "[t]here is no evidence of transmission (spread) of AIDS virus even though ... family members shared food, towels, cups, razors, even toothbrushes, and kissed each other." *Id.*

Defendants assert that their policy restricting HIV positive inmates from working in food services is rationally related to a legitimate penological interest. Defendants' Response, at 12. As indicated earlier, this policy was developed in response to situations that threatened the security of the prison, particularly those inmates who are HIV positive. *Id.*

■ Defendants' argument is unpersuasive. First, defendants' argument is based on the rational basis test. However, § 504 does not employ the rational basis test; it flatly prohibits discrimination against "otherwise qualified individual[s] with handicaps." 29 U.S.C. § 794. "[T]he statute provides that a recipient ... may not discriminate on the basis of handicap, regardless of whether there is a rational basis for so discriminating." *Pushkin v. Regents of University of Colorado,* 658 F.2d 1372, 1383 (10th Cir.1981); *Jacobson v. Delta Airlines,* 742 F.2d 1202, 1206 (9th Cir.1984) (citing with approval *Pushkin's* rejection of the rational basis test).

■ Defendants rely on *Farmer v. Moritsugu,* 742 F.Supp. 525 (1990), for the proposition that policies that prohibit HIV positive inmates from working in food service are constitutionally permissible. The rational relationship test is properly employed when it is alleged that a prison regulation restricts a "constitutional" right. *See Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261–62, 96 L.Ed.2d 64 (1987). However, *Farmer,* which was based on the equal protection clause, has no relevance to plaintiffs' challenge under § 504.

In addition, defendants' concerns that the policy "serves an important interest in protecting [HIV positive] inmates who are unconvinced of prevailing medical opinion regarding the difficulty of transmission of the AIDS virus," Defendants' Response, at 14, is insufficient under § 504. Defendants further state: "Although unfounded, inmate fear that they may contract the HIV virus from infected inmates through casual conduct is prevalent, despite programming efforts by Defendants." *Id.* ADOC's policy is not based on a fear of transmission of the disease. Rather, it is based on the unfounded fears and mythologies of the prisoners. Indeed, DOC's Facility Health Administrator believes that prisoners would continue to have irrational fears even if they were to receive education. Plaintiffs' SOF, at para. 39.

The basis for defendants' policy is inconsistent with § 504. Congress enacted § 504

> to ensure that handicapped individuals are not denied jobs or other benefits because of the prejudiced attitudes or *ignorance of others....* Congress acknowledged that *society's accumulated myths and fears about the disability and disease are as handicapping as are the physical limitations that flow from actual impairment....* The Act is carefully structured to replace such reflexive reactions to actual or perceived handicaps with actions based on reasoned and medically sound judgments....

*Arline,* 480 U.S. at 284–85, 107 S.Ct. at 1129 (emphasis added). Furthermore, while defendants arguably may make an individual determination as to whether a particular HIV positive prisoner seeking a job assignment is "otherwise qualified" to perform the duties of a food service employee, DOC's blanket prohibition against all HIV positive prisoners is clearly inconsistent with § 504:

> The fact that *some* persons who have contagious diseases may pose a serious health threat to others under certain circumstances does not justify excluding *all* persons with actual or perceived contagious diseases.

*Id.* at 285, 107 S.Ct. at 1129–1130. By prohibiting categorical exclusions, § 504 protects "handicapped individuals from deprivations based on prejudice, stereotype, or unfounded fear, while giving appropriate weight to such legitimate concerns of grantees as avoiding exposing others to significant health and safety risks." *Id.* at 287, 107 S.Ct. at 1131 (footnotes omitted).

In short, ADOC's justification (i.e., the irrational fears of the inmates) for its blanket prohibition concerning HIV positive inmates is inconsistent with § 504. Section 504 requires that an individual determination be made as to whether a handicapped person is "otherwise qualified." *Id.* at 287, 107 S.Ct. at 1130. Defendants' policy cannot withstand summary judgment unless they can prove that each HIV-positive prisoner would present a significant risk of transmitting the virus if he or she worked in food services, and that no reasonable accommodation would reduce the risk to an insignificant level. *See id.* at 287–88, 107 S.Ct. at 1130–31.

It should be noted that defendants, however, did not argue that HIV-positive inmates present a significant risk of transmitting the virus. Indeed, defendants implicitly concede that there is no risk that such transmission would occur. *See* Defendants' Response, at 14 (policy protects inmates and staff "from retaliation by inmates who are unconvinced of prevailing medical opinion regarding the difficulty of transmission of the AIDS virus. Although unfounded, inmate fear that they may contract the HIV virus from infected inmates through casual conduct is prevalent, despite programming efforts by Defendants."). Thus, unless defendants make a showing that there is a significant risk of transmission, and that they cannot reasonably accommodate the HIV-positive inmate to reduce the risk to an insignificant level, the court has no choice but to grant summary judgment on plaintiffs' § 504 claim.

It should also be noted that even if the Court were to accept defendants' argument concerning security and the possibility of a riot, summary judgment would still be granted in plaintiffs' favor because defendants did not properly oppose the motion for summary judgment. "[B]ecause an affiant is not subject to cross-examination, the judge deciding the motion must exercise considerable care in assigning weight to the affidavits presented to him." 10A Wright, Miller & Kane, *Federal Practice and Procedure* § 2738, at 473 (West 1983). "[U]ltimate or conclusory facts and conclusions of law, as well as statements made on belief or 'on information and belief,' cannot be utilized on a motion for summary judgment." *Id.* at 486–88 (footnotes omitted). Here, the affidavits relied upon by defendants in opposing plaintiffs' motion appear to be based on speculation, conclusory statements, and allegations not based on personal knowledge. For example, the affidavit of J.C. Keeney states: "It is well known that one of the major causes of riots at correctional institutions in the United States is inmate dissatisfaction with food services." Defendants' Response, Exhibit 1, at para. 7. The affidavit of Mr. Terry Stewart, Assistant Director for Human Resources Development and Training, provides: "[T]his practice [of denying jobs to HIV-positive persons] is necessary in order to maintain security and order of the facilities." *Id.* at Exhibit 4, at para. 4.

## CONCLUSION

The Court will grant plaintiffs' motion for partial summary judgment. First, with respect to attorney contact visitation, defendants did not cite to a single incident that showed escapes and assaults occurred as a result of contact visits. The alternative means (i.e., mail, non-contact visitation and non-monitored telephone calls) asserted by defendants are simply inadequate to justify a blanket denial of this constitutionally protected right. Contact visits are necessary so that the attorney and the prisoner can establish effective attorney-client communication. Contact visits also help the attorney ascertain the inmate's demeanor.

Defendants also did not provide any evidence that contact visits, including those at SMU, will have a significant impact on inmates, guards or prison resources. Fi-

nally, there are ready alternatives (i.e., searching the prisoner and attorney before and after the legal visit and observing the attorney and prisoner during the legal visit) that address defendants' security concerns. Under the circumstances, defendants' blanket prohibition is an exaggerated response, especially given that there are no reported incidents of any assaults or violence as a result of a contact attorney visit.

With respect to the assignment of HIV-positive prisoners to food service jobs, it is clear that prisoners who are HIV-positive are "handicapped" within the meaning of § 504 of the Rehabilitation Act. As such, defendants must make an individual determination that each HIV-positive prisoner presents a significant risk of transmitting the virus if he or she worked in food services. Defendants' blanket policy is clearly not sufficient under § 504 because it excludes "all" inmates who test HIV-positive.

Also, it should be noted that defendants did not attempt to justify their policy on the ground that there is a significant risk of transmitting the virus.[4] Rather, they argued, without providing any evidence, that allowing HIV-positive inmates to work in food service threatens security of the prison in that inmates would riot if they knew they were being served by someone who was HIV-positive. Defendants' unsubstantiated and unfocused fears are an insufficient basis to curtail fundamental constitutional rights and rights provided by the Rehabilitation Act.

Based on the foregoing, IT IS ORDERED THAT:

(1) Plaintiffs' Motion for Partial Summary Judgment (Doc. # 230) is granted.

(2) Defendants are hereby enjoined from prohibiting contact visits between inmates and their attorney(s) in all facilities of the Arizona State Prison system. Defendants may deny a contact visit to an individual inmate only for good cause. The reason(s) for such denial shall be in writing and provided to the inmate and his or her attorney *prior* to the visit. Defendants shall implement, through their current administrative process, procedures whereby the inmate and/or attorney may challenge the denial of contact visits.

(3) Defendants are hereby enjoined from denying food-service employment to inmates found to be HIV-positive absent a written determination that an individual inmate is not "otherwise qualified" to perform the job in that he or she cannot perform the essential functions of the job, and that defendants cannot reasonably accommodate the inmate such that he will be able to perform those functions. This ruling applies to all facilities in the Arizona State Prison system.

---

**4.** Indeed, defendants implicitly concede that there is no significant risk of transmission. *See* Defendants' Response, at 14.