John SPELLMAN, Plaintiff,

v.

Joe HOPPER, et al., Defendants.

No. Civ.A.95–D–1585–N.

United States District Court,
M.D. Alabama,
Northern Division.

Oct. 1, 1999.

Rhonda Brownstein, Southern Poverty Law Center, Montgomery, AL, for Plaintiff.

Alice Ann Byrne, Office of Attorney General, Assistant Attorney General, Montgomery, AL, Andrew W. Reid, Alabama Dept. of Corrections, Legal Div., Montgomery, AL, for Defendants.

## ORDER

DE MENT, District Judge.

This cause is now presented to the court on the Recommendation of the Magistrate Judge, filed August 25, 1999, and clarified on September 24, 1999; and plaintiff's objections, filed September 22, 1999.

The court has carefully read the recommendation and objections and is of the opinion that said recommendations are well taken and are due to be adopted, approved and affirmed. It is, therefore,

CONSIDERED, ORDERED and AD-JUDGED as follows:

1. That plaintiff's objections be and the same are hereby OVERRULED;

2. That the Recommendation of the Magistrate Judge in this cause be and the same is hereby ADOPTED, APPROVED and AFFIRMED; and

3. That judgment is hereby entered for the plaintiff and appropriate declaratory and injunctive relief is hereby GRANTED. The parties are to refer to the Recommendation of the Magistrate Judge filed August 26, 1999 regarding a briefing schedule and submission of proposed draft of a permanent declaratory and injunctive order for the court's review.

## RECOMMENDATION OF THE MAGISTRATE JUDGE

WALKER, United States Magistrate Judge.

Plaintiff John Spellman is an inmate in administrative segregation at the William E. Donaldson Correctional Facility. Defendant is the Commissioner of the Alabama Department of Corrections.[1] Spellman alleges that the Alabama Department of Corrections' absolute prohibition on prisoners' receipt · of subscription magazines and newspapers in administrative segregation violates the First Amendment to the United States Constitution.[2] For the reasons discussed below, the court agrees.

### I. Background

In Alabama's state prison system, administrative segregation is "the placement of an inmate into a confinement area within a correctional facility which removes him from exposure and direct contact with the general population of the correctional facility." P.Ex. 6 (Administrative Regulation Number 433). Administrative segregation inmates are housed in single occu-pancy cells. *Id.;* P.Ex. 16 (Defendant's admission # 7). As of April 1997 there were six or seven hundred inmates in administrative segregation throughout Alabama's prison system, Tr.–1 at 148, and 1500 to 2000 inmates in all categories of segregation. *Id.* The court takes judicial notice that the total number of inmates housed by the Department of Corrections in April 1997 was 19,892.

Inmates may be assigned to administrative segregation for several reasons: (1) when an inmate's presence in the general population "may pose a serious threat to property, self, staff or other inmates, or to the security or orderly operation of the institution"; (2) pending the completion of an investigation or a disciplinary due process hearing; (3) as a result of placement in close or maximum custody; (4) as an initial placement upon a sentence to life imprisonment without parole; or (5) during evaluation or outpatient treatment for psychological problems. *Id.* Assignment to administrative segregation is not a disciplinary measure. P.Ex. 16 (Defendant's admission # 9); Tr.–1 at 159. Inmates may be confined in administrative segregation for long—even indefinite—periods of time. Tr.—1 at 164; P.Ex. 16 (Defendant's admission # 17). For example, at the time of the hearing, plaintiff Spellman had served approximately 12 years of a life sentence, and had been assigned at various times to administrative segregation at five different correctional institutions. Tr.–1 at 8. When this case was heard, Spellman had been in administrative segregation at Donaldson for 84 days "for my protection," Tr.–1 at 11, and his continued incarceration in administrative segregation was "indeterminate." Tr.–1 at 14–15.

Inmates in administrative segregation generally are locked in their cells every day for 23 hours and 15 minutes. Tr.–1 at 29. During the remaining 45 minutes,

---

1. Joe Hopper was the commissioner when the court held an evidentiary hearing in this case; Michael Haley is the current commissioner.

2. Plaintiff seeks declaratory and injunctive relief only.

they exercise by walking around in a circle with their hands handcuffed behind their backs in the prison yard, which is usually a small concrete fenced-in area. Tr.–1 at 29–30. They also may be handcuffed and escorted to the shower. Tr.–1 at 41. Inmates in administrative segregation do not work, go to school or participate in any organized activity during the day. Tr.–1 at 30. They eat in their cells. Tr.–1 at 44. They cannot watch television, but they may buy a radio for $15 or $20 from the prison if they can afford it.[3] Tr.–1 at 20. Each month, administrative segregation inmates may make one telephone call and receive one visit. Tr.–1 at 42, 160; P.Ex. 6. Regulation 433 ostensibly permits inmates in administrative segregation to have materials for one hobby craft project[4] per month but, in practice—at least at Donaldson, St. Clair, Holman, Kilby and Easterling correctional facilities—hobby crafts are prohibited in administrative segregation. Tr.–1 at 52–53. Administrative segregation inmates can write letters, work on legal matters, and clean their cells. Tr.–1 at 30–31. Otherwise "there's just not much to do, really." Tr.–1 at 31.

In this lawsuit plaintiff challenges the constitutionality of Regulation 433 to the extent that it absolutely prohibits administrative segregation inmates from receiving any subscription newspapers or magazines. Regulation 433, which has been in effect since 1987, restricts reading material for inmates in administrative segregation to "one (1) religious book of their preference and one (1) additional book or magazine drawn from the institutional library. No other reading material will be permitted, with the exception of law books from the institutional law library." P.Ex. 6.[5] Regulation 433 also provides that "[i]nmates in Administrative Segregation will not be

permitted ... [p]ersonal newspaper or magazines." *Id.* A 1990 amendment to the regulation allows such inmates to possess "[o]ne (1) Alcoholics Anonymous Book and one (1) Narcotics Book." *Id.* Another amendment, promulgated in 1991, provides that:

> inmates who are placed in administrative segregation who have been authorized while housed in general population to subscribe to receive personal newspapers or magazines, will have the opportunity and responsibility to cancel such subscription within the first thirty (30) days of their stay in administrative segregation. Any newspapers or magazines received after this period of 30 days will be disposed of by the administration as contraband.

*Id.*

Individual correctional institutions within the Alabama Department of Corrections may adopt standard operating procedures (SOPs), which are "policy statements that [are] issued at the institutional level to implement administrative regulations." Tr.–1 at 15; *see also* P.Ex. 1. Administrative regulations "apply to all institutions across the board." Tr.–1 at 15. "SOP's are institution specific." *Id.* The SOPs before the court differ somewhat from the requirements of Regulation 433 with regard to reading material allowed in administrative segregation. For example, at Donaldson, the SOP permits "One (1) religious book of preference, one (1) book [or] magazine, may be exchanged monthly. No newspaper or subscription magazine." P.Ex. 18. Thus, unlike Regulation 433, the Donaldson SOP appears to prohibit Alcoholics Anonymous or Narcotics Anonymous books. At Easterling, no magazines

---

**3.** Plaintiff testified, based on his experience in repairing radios, that approximately half of the inmates in administrative segregation "appear to have radios." However, he has never actually counted the radios. Tr.–1, 25.

**4.** Hobby crafts are "mostly wood products that individuals handcraft." Tr.–1, 45.

**5.** Law books are limited to "two law books at any given time. When a new law book is needed, an old book must be surrendered." *Id.* at Annex A.

are permitted, but inmates may possess more personal books than at Donaldson. The Easterling SOP provides that "[i]nmates in Administrative Segregation may have in their possession one (1) religious book (3) personal books of their preference and one (1) book drawn from the institutional library. No other reading material will be permitted with the exception of two (2) law books from the Law Library." P.Ex. 14.[6] Because these SOPs conflict with Regulation 433 in some respects, the court interprets them for purposes of this opinion to extend no more broadly than does the Regulation itself, which authorizes only one religious book, one additional book or magazine drawn from the institutional library, and one Alcoholics Anonymous and Narcotics Anonymous book in administrative segregation. P.Ex. 1 at I(B) ("[a]dministrative regulations are designed as comprehensive guidelines by which the Department standardizes administrative and operational functions," and they "serve as the basis for institutional and facility Standard Operating Procedures (SOP[s]).").

Inmates in the general prison population are allowed to have more reading materials than are administrative segregation inmates. Administrative Regulation No. 303 provides that general population inmates "may receive a limited number of publications, books, magazines, newspapers, etc. (publications) so long as the publications are received directly from the publisher and *pre-paid* from inmate's Prisoners Money on Deposit Account [P.M.O.D.]." P.Ex. 4 (emphasis in original). Under this regulation, "each Institutional Head will establish a specific limit on the number of publications each inmate may receive." *Id.; see also* Tr.–1 at 31. The limit is to be "based upon space, security, fire, and operational considerations and on capacity and size of each institution's mail handling facility. Different institutional limits may

be established for different inmates based upon custody, living space assignment, security, or maintenance of order." P.Ex. 4. However, under any circumstances an inmate is not allowed to receive "more books, magazines and/or newspapers than he/she can safely store in a personal locker along with other authorized possessions." *Id.; see also* P.Ex. 10 (officers shall "[e]nsure personal property allowed does not exceed the amount that can be properly stored....").

At Donaldson the relevant SOP provides that general population inmates may receive "[a] total of two publications [books, newspapers or magazines] ... provided magazines are from an approved list, and subscription cost has been paid from inmate's P.M.O.D. account in advance." P.Ex. 9 (III(G)). The Donaldson SOP also states that inmates "may receive a limited number of two (2) books or magazines other than newspapers, produced by reputable publishing concerns." *Id.* (III(H)). These provisions of the Donaldson SOP are somewhat confusing, but it appears to the court that, at least at that correctional facility, general population inmates may receive at least two magazines or newspaper subscriptions, whether daily, weekly, monthly, or otherwise.[7]

Inmates assigned to protective custody are allowed to receive the same number of magazines and newspapers as are inmates in the general population. Tr.–1 at 46–47. Death row inmates are permitted to possess four books or magazines by Administrative Regulation No. 421, but "in practice, at the SOP level, they're allowed the same as population...." *Id.* at 47; Tr.–1 at 163–64. Inmates in administrative segregation, protective custody and on death row are housed in cells of equal size. P.Ex. 16 (Defendants' admission # 13); Tr.–1 at 163–64. Administrative segregation cells and general population cells also

---

6. This SOP does not indicate how often the single library book allowed may be exchanged.

7. Neither party provided the court with any other facility's SOP for general population inmates.

are equal in size. P.Ex. 16 (Defendants' admission # 9). General population inmates are housed two to a cell or, in some cases, they stay in dormitories containing approximately 90 or 100 individuals. Tr.–1 at 11.

## II. Discussion

■ Inmates have a First Amendment right to receive magazines and newspapers through the mail. *Allen v. Coughlin*, 64 F.3d 77, 81 (2d Cir.1995); *Guajardo v. Estelle*, 568 F.Supp. 1354, 1366 (S.D.Texas 1983); *Payne v. Whitmore*, 325 F.Supp. 1191, 1193 (N.D.Cal.1971). "It is well established that prisoners retain First Amendment rights." *Owen v. Wille*, 117 F.3d 1235, 1237 (11th Cir.1997). "As the Supreme Court has emphasized, '[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution.'" *Id.* (quoting *Thornburgh v. Abbott*, 490 U.S. 401, 407, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989)).

"[E]ven though this court engages in a deferential review of the administrative decisions of prison authorities, the traditional deference does not mean that courts have abdicated their duty to protect those constitutional rights that a prisoner retains." *Fortner v. Thomas*, 983 F.2d 1024, 1029 (11th Cir.1993). "However, the [Supreme] Court has also recognized that 'these rights must be exercised with due regard for the "inordinately difficult undertaking" that is modern prison administration.'" *Wille*, 117 F.3d at 1237 (quoting *Abbott*, 490 U.S. at 407, 109 S.Ct. 1874). "Federal courts must scrupulously respect the limits on their role by not thrusting themselves into prison administration; prison administrators must be permitted to exercise wide discretion within the bounds of constitutional requirements. *Pope v. Hightower*, 101 F.3d 1382, 1385 n. 2 (11th Cir.1996). "[T]he Supreme Court has recognized that 'courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform.'" *Id.* at 1384 (quoting *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974)).

"Accordingly, in *Turner* [v. *Safley*, 482 U.S. 78, 85, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)] the Supreme Court formulated a standard of review for prisoners' constitutional claims that strikes a balance between the policy of judicial restraint regarding prisoner complaints and the need to protect constitutional rights." *Id.* "The *Turner* Court held that when a prison regulation impinges upon on inmate's constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* "The Supreme Court considered this deferential standard necessary if 'prison administrators . . . and not the courts, [are] to make the difficult judgments concerning institutional operations.'" *Id.* (citation omitted).

■ "The Turner Court identified several factors that serve to channel the reasonableness inquiry: (1) whether there is a 'valid, rational connection' between the regulation and a legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the asserted constitutional right that remain open to the inmates; (3) whether and the extent to which accommodation of the asserted right will have an impact on prison staff, inmates, and the allocation of prison resources generally; and (4) whether the regulation represents an 'exaggerated response' to prison concerns." *Id.* The court's application of the *Turner* factors to this case leads it to conclude that the absolute prohibition on subscription magazines and newspapers applied to administrative segregation inmates in Alabama is not reasonably related to legitimate penological interests.

### A. The "valid, rational connection" between the regulation and a legitimate governmental interest put forward to justify it.

Defendant asserts several government interests to justify the ban on subscription magazines and newspapers in administrative segregation. In his special report, defendant contends that the regulation

has a logical connection to maintaining security and health standards. If there were not a limit on the amount of personal items, it would make it more difficult for officers to locate contraband as more hiding places would enable prisoners to conceal contraband items. Additionally, a great amount of personal property is a fire hazard and a fire safety violation to have a great amount of material in the limited space available.... The defendants [sic] do not have to allow the plaintiff to keep in his personal possession a book "to read in bed." Third, the impact of not allowing a limit on the number of personal items an inmate possesses would be a risk to security and health. Having unlimited personal property would make it more difficult to keep areas of the prison clean thereby making a pest control problem even worse. As discussed above, security would likewise be jeopardized in that it would be easier for inmates to hide items if there was a vast amount of personal property allowed. If inmates were allowed all the property they wished, half-eaten food items would be kept in the living area of the institutions. Excess personal property also represents a fire and safety hazard.

Special Report at 4.[8]

In other submissions or in testimony, defendant also asserts additional government interests to justify the ban on subscription publications. The affidavit attached to the special report, offered by former Commissioner of the Alabama Department of Corrections Ron Jones, repeats defendant's view that "the accumulation of personal items ... needs to be controlled in the interest of space, security, fire and operational considerations of the

institution." The affidavit adds that "this restriction imposes discipline on prisoners who are difficult to control...." Also, testimony by an expert for defendant at the hearing suggested additional security concerns: that inmates might resist officers who try to take away copies of publications from prisoners, Tr.–2 at 5–7, and that inmates might make weapons (e.g., "zip guns") out of magazines or newspapers. Tr.–2 at 10–12. Defendant's post-trial brief summarizes the "legitimate reasons" for the policy as follows: "Reading material is limited in order to control the flow of contraband; fire safety hazards, flooding of cells, deterrence of general populations [sic] inmates from breaking rules, pest control problems and impose discipline [sic] on prisoners who are difficult to control." Post Trial Brief of the Defendant at 3.

Taken together, the government interests that defendant asserts to justify the subscription publications ban appear to consist of the following: (1) preventing fires; (2) promoting health and sanitation through control of (a) pests and (b) flooding; (3) maintaining security by deterring (a) concealment of contraband, (b) fabrication of weapons, and (c) altercations between inmates and guards over inmate property; and (4) promoting "discipline." This Recommendation examines each of these interests, and its connection to the policy at issue, in turn.

## 1. Preventing fires.

There is no dispute in this case that preventing fires in correctional facilities is a legitimate government interest. Therefore, the question before the court is whether there is a valid, rational connection between the absolute ban on subscrip-

---

**8.** Defendant's special report incorrectly assumes that plaintiff seeks unlimited access to subscription publications in administrative segregation. Plaintiff, however, indicates in his response to the special report that he has "at no time suggested that inmates be allowed an unlimited quantity of publications. It is reasonable to expect that some valid regula-

tion of the amount of inmate property may be maintained while accommodating legitimate assertions of the right to receive publications. The standard restriction applied to general population inmates would be equally effective if applied to segregation." Typed Response to Special Report at 5.

tion magazines in administrative segregation and fire prevention. The court cannot conclude from the evidence before it that there is such a connection.

Certainly, some fires are set by inmates in administrative segregation. Tr.–1 at 116, 139. However, matches are prohibited in these cells. Tr.–1 at 43, 138. Further, the accumulation of property—and, thus, flammable material—in administrative segregation cells is strictly controlled by the size of available storage under Regulation 433. P.Ex. 6 ("Inmates in administrative segregation will keep all permitted items in their locker box or storage box except when in use. No items will be displayed in the cell.").

Defendant presented no testimony concerning the frequency of fires in administrative segregation within the Alabama Department of Corrections after matches were banned and possessions limited.[9] The court heard evidence about only one specific fire in segregation: Frank Griswold, the director of external services for the Alabama Department of Corrections, testified that a fire had been set in segregation at the Limestone Correctional Facility on the day before the evidentiary hearing. Tr.–1 at 139. The inmate started the fire with "[s]heets, clothing, papers, everything that he had in the cell, including a map that was set on fire." *Id.* Obviously, the subscription ban had no effect in preventing this particular fire. *See* Tr.–1 at 151.

Courts have recognized the tenuousness of the connection between such prohibitions on publications and fire prevention. *See, e.g., Parnell v. Waldrep,* 511 F.Supp.

764, 767 (W.D.N.C.1981) (finding "no incidents of ... starting fires" after inmates were permitted to receive newspapers and magazines at jail in response to lawsuit); *Kincaid v. Rusk,* 670 F.2d 737, 743 (7th Cir.1982) (restrictions on some magazines and all hardbound books "apparently do not significantly reduce the risk of fire or damage to jail facilities.") Defendant himself produced no testimony concerning the effect of Regulation 433 on the incidence of fires in administrative segregation after the no-subscriptions policy was instituted in 1987. *Cf.* Tr.–1 at 39. At most, defendant is speculating that the rule has or ought to have some deterrent value.

However, given the fact that inmates in administrative segregation are permitted to have mattresses, blankets, pillow cases and sheets, clothing, letters and writing materials, legal papers, Bibles, and a limited number of non-subscription magazines and books, *see* P.Ex. 6, the court is compelled to conclude that inmates who wish to set fires can and will do so, whether or not they have subscription publications for fuel. Thus, deprivation of such publications would have, if at all, a *de minimis* effect on the number of fires set in administrative segregation. *See Mann v. Smith,* 796 F.2d 79, 82 (5th Cir.1986) ("Because the jail has a no-smoking rule for inmates and because the jailers permit the inmates to have other forms of paper and similar materials, the official rationale seems tenuous at best."); *Kincaid,* 670 F.2d at 744 ("[T]he total ban on newspapers was arbitrary and unjustifiable when the two hazards allegedly caused by the possession of newspapers—fire damage and jammed

---

9. Defendant's expert, Lansom Newsome, a former prison warden and former deputy commissioner in Georgia, testified that "I know where I was working in the prisons—in the prisons where I was working—that I had more fires set in segregation than I did in general population." Tr.–2 at 46. On the other hand, plaintiff's expert, George Sullivan, a former prison warden in Oregon and New Mexico and a former deputy director in the Colorado Department of Corrections, testified that "[m]ost segregation units today—as

a matter of fact, many of our prisons—do not permit smoking. So, therefore, if the staff are doing their jobs in enforcing the no-smoking rule, they're also enforcing that there's no access to matches, so a fire hazard essentially becomes zero." Tr.–1 at 96; *see also Gregory v. Auger,* 768 F.2d 287, 289 (8th Cir.1985) ("cellblock fires have been eliminated entirely ... by new regulations prohibiting inmates from possessing matches."). Neither expert testified about fires in administrative segregation in Alabama prisons.

plumbing—could as well be caused by the sort of reading material detainees were permitted to have."); *Payne v. Whitmore,* 325 F.Supp. 1191, 1193 (N.D.Cal.1971) ("Jail cells are already filled with an abundance of materials quite suitable for fire starting ...; yet no one suggests that cells ought to be stripped of bedding, clothing, toilet paper, writing materials, and so on.").

In addition, if defendant's concern is not the number of fires set, but their intensity or duration—that is, if the subscription ban exists to deprive inmates of *extra* fuel to add to fires that may be set anyway with legal papers, mattresses, sheets, etc.—this concern is already addressed by the general property restriction of Regulation 433. In other words, defendant is prepared to tolerate whatever fire hazard is caused by the quantity of flammable materials of various kinds that will fill a locker or storage box in an inmate's cell, and no more. If prisoners have greater than the approved quantity of possessions at any given time—whether in the form of newspapers, legal materials, or clothing—Regulation 433 permits removal of the excess without resort to the subscription ban. Accordingly, the prohibition on subscription publications is not rationally related to the goal in question because it is, in this respect, mere surplusage.

The court's conclusion that the prohibition on subscription publications in administrative segregation is not rationally related to fire safety is supported by defendant's failure to ban such publications in the general population, protective custody, or on death row. As noted above, inmates in these three classifications may receive at least two subscription publications. Their cells are equal in size to administrative segregation cells, and they may possess at least as much property, if not more. *See* P.Ex. 5, 8; Tr.–1 at 161.

Indeed, general population inmates are housed two to a cell (if they are not in dormitories) and, thus, they may have at least double the property permitted in a one-man cell, and may presumably set much more dramatic fires unhindered by any ban on subscription publications if they wish to do so. Further, general population inmates may possess matches. Tr.–1 at 43.

Defendant makes the conclusory suggestion that administrative segregation inmates are different from those in general population in their propensity to disobey the rules, and implies that this accounts for the difference in publication limits. *See* Tr.–1 at 141 ("[U]nderstand that inmates in these units are put there for some reason, acting out, or whatever the reason is, and they pose more of a problem to you than the general population."); Tr.–1 at 168 ("The difference is, is that the people in general population are generally obeying the rules. We have less problem out of those....."). However, death row and protective custody inmates may receive two subscription publications, yet inmates in these classifications also appear likely to pose more behavioral problems than those in the general population. The court recognizes that defendant's burden of production is minimal. However, absent *any* testimony actually linking the asserted tendency of administrative segregation inmates to pose problems or break rules to an increased propensity on their part to set fires—particularly as compared with inmates on death row or in protective custody [10]—the court cannot conclude that the subscription publication ban bears a rational relationship to the goal of preventing fires in administrative segregation, when such an absolute prohibition does not operate in most of the rest of the prison. This interest is not rationally related to the rule in question.[11]

---

**10.** *See* Tr.–1 at 95 (According to plaintiff's expert, fire safety is considerably less of a problem in administrative segregation than in the general population.).

**11.** One other court in Alabama has ruled in an unpublished opinion that Regulation 433's ban on subscription publications is constitutional under *Turner* because it was "undisput-

## 2. Promoting health and sanitation by controlling pests and flooding.

### a. Pest control

In his special report, defendant suggests that the ban on subscription publications in administrative segregation is rationally related to the undisputedly legitimate government interest in controlling "pests" in prison.[12] "Having unlimited personal property," defendant maintains, "would make it more difficult to keep areas of the prison clean thereby making a pest control problem even worse." At the evidentiary hearing, defendant presented little testimony in support of this assertion. Witness Frank Griswold and defendant's counsel conducted this exchange, which was the extent of defendant's evidence on this point:

Q. Now, you said health. What is your concern, or reason for health, as to limiting the amount of reading material?

A. Well, in our state, we do have a problem with pests, and the more you get in there, the bigger the problem.

Q. Well, why can't you just tell the inmates to clean their cells?

A. You do, but—

Q. Do they clean their cells?

A. Somewhat. But whatever you allow them to have, they're going to keep. I agree with the other expert, that they're pack-rats.

Q. And I believe Mr. Sullivan stated, well, just give them a disciplinary, if they don't clean up. Are these inmates already in disciplinary segregation?

A. Well, depending on the segregation you're talking about, Ms. Byrne.

Q. They're already in a single cell, are they not?

A. They're in a single cell, and they're there, because there's some type problem that put them there.

Q. What are you going to do to them?

A. I'm sorry?

Q. What are you going to do to them?

A. Not much more than what they've got, take away a few more privileges.

Q. And does taking away privileges always work?

A. No ma'am.

Tr.–1 at 137–38.

The court takes defendant's point from this exchange to be that: (1) Regulation 433 bans subscription magazines and newspapers in administrative segregation because certain unidentified "pests" hide or nest in these publications; (2) inmates in administrative segregation clean up only "somewhat"; and (3) these inmates are more difficult to force to clean their cells than are other prisoners because they are already in single cells, they do not have many privileges left to take away, and they *do not always respond* to removal of privileges anyway. If this is defendant's argument, its logic is self-evidently flawed— even apart from the circularity of arguing that one privilege (subscription publications) should be denied because there are already too few privileges to rescind when discipline is necessary.[13]

As with the fire prevention rationale, the pest control rationale suffers from the fact

ed that defendants follow this policy due to the high number of fires set by inmates." *Strong v. Thigpen*, No. 88–AR–1385 at 27 (N.D.Ala. February 22, 1991), recommendation adopted by district court (April 2, 1991) (opinion attached to defendant's Motion to Stay Until Qualified Immunity is Determined). However, this case, in which plaintiffs also raised 21 other claims, was decided on summary judgment with a limited record, and no disputed facts on this issue.

**12.** It is not clear which pests are at issue here; defendant has not identified them. The court assumes that defendant intends to refer to the usual suspects, such as cockroaches and rodents.

**13.** If these inmates do not respond positively to the removal of privileges (e.g., canteen, visitation, and telephone privileges), it is difficult to justify Regulation 433 on the ground that *it* has some effect in "disciplining" such inmates. *See infra.*

that Regulation 433's publication ban merely regulates what is already regulated, P.Ex. 6 (prescribing property limits and storage requirements, and providing that "[a]ll cells will be kept clean and orderly").[14] *See also* P.Ex. 10 (III(K)) and Tr.–1 at 43. In addition, the regulation does not address other potential havens for pests in administrative segregation cells. *Id.* (permitting clothing, legal papers, letters, one religious book, and one library book or magazine in such cells). Further, the general population, death row, and protective custody are, again, exempt from this restriction. Yet general population cells housing two inmates present a much greater opportunity for infestation than do administrative segregation cells—especially given that general population inmates may spend $40 per week at the canteen for food and other items, Tr.–1 at 44, and may also have hobby crafts, Tr.–1 at 45, whereas administrative segregation inmates may spend only $15 per week on canteen items and are denied hobby crafts. Tr.–1 at 44. The court has no evidence before it that the pest control problem is actually worse in administrative segregation cells than in other cells whose inmates are not forbidden subscription publications; nor any testimony concerning a single actual administrative segregation inmate who would not clean his cell despite disciplinary efforts, thereby causing a pest control problem; nor any testimony that the publications ban has had even a mild or incremental effect on the degree of infestation (also unknown to the court) in these cells.[15] For these reasons, the court has before it insufficient evidence to conclude, despite its application of the most deferential standard, that there is a valid, rational connection between the publications ban in Regulation 433 and the government's legitimate interest in pest control.

### b. Preventing floods

Defendant's concern about inmates causing floods with subscription magazines and newspapers apparently was not sufficiently grave to prompt him to assert flood prevention as a rationale for Regulation 433 until the evidentiary hearing was over and he filed his post trial brief. This is too late. Certainly, no evidence was presented on this point, which appears to be an afterthought, nor was the exact flood hazard explained. Assuming that defendant meant to suggest that administrative segregation inmates are a particular threat to stop up their plumbing with *Time* and *Newsweek* —and that defendant had properly asserted this interest—the court would have difficulty finding a rational relationship between the regulation and the interest asserted, for reasons similar to those stated *supra* concerning fire prevention and pest control. *See Mann,* 796 F.2d at 82 ("inmates had sheets, blankets, pillows and clothing that could be used to interfere with the plumbing."); *Kincaid,* 670 F.2d at 744 ("other paper and nonpaper material (e.g., shoes) could just as easily jam toilets ...."); *Parnell,* 511 F.Supp. at 768 ("no incidents of plugging toilets ... occurred" after jail inmates allowed to receive newspapers and magazines.); *Payne,* 325 F.Supp. at 1193 ("Jail cells are already filled with an abundance of materials quite suitable for ... drain clogging; yet no one suggests that cells ought to be stripped of bedding, clothing, toilet paper, writing materials, and so on.").

14. Plaintiff's expert testified that the way to address pest control problems is to "provide inmates cleaning materials, cleaning equipment and the requirement that they clean their cells, and discipline, if they do not. And, of course, they're controlled by limiting the amount of items that they can have in their cells. It's a simple management process." Tr.–1 at 95.

15. Poisons, traps or sprays appear to be a more direct means of pest control than banning magazine subscriptions. Defendant did not indicate whether or not it has tried such methods.

**3. Maintaining security [16] by deterring concealment of contraband, fabrication of weapons, and altercations between inmates and guards over inmate property.**

**a. Contraband**

Defendant asserts that there is a valid, rational connection between Regulation 433's ban on subscription publications in administrative segregation and the government's legitimate interest in deterring inmates from concealing contraband in prison. Contraband is sometimes found in administrative segregation cells. Tr.–2 at 45–46. Defendant appears to argue that the Department of Corrections prohibits subscription magazines or newspapers in administrative segregation because they provide hiding places for contraband.[17] *See* Special Report at 4 ("it would be easier for inmates to hide items if there was a vast amount of personal property allowed."). Again, the court cannot conclude

that the restriction at issue has a valid, rational connection with the undisputedly legitimate interest in security that it allegedly promotes.[18] *See Van Poyck v. Singletary,* 106 F.3d 1558, 1560 (11th Cir.1997) (eliminating the exchange of contraband among inmates is a legitimate security interest). This is so for two reasons.

First, the defendant's argument that the Department of Corrections prohibits subscription magazines or newspapers in administrative segregation because they provide hiding places for contraband is undercut by the fact that the prison does not impose the same restriction on the general population. Here, defendant cannot argue that administrative segregation inmates are more likely than general population inmates to have and conceal contraband. All parties concede that general population inmates have far greater access to contraband than do administrative segregation inmates, yet the former may

---

**16.** The court notes, in connection with all the security justifications advanced for defendant's policy, that there is contrary evidence before it that allowing subscription magazines and newspapers in administrative segregation would enhance security. Sullivan testified:

> One of the foremost concerns of a prison manager with inmates assigned to segregation status is psychological deterioration, because as that occurs, of course, you're damaging the person. For immediate control, these people, as they deteriorate, become—more frequently than not—either very withdrawn, and curl up in infancy, or they become acting out and aggressive people. It depends on the turn that their psychology takes.
>
> Once a person has become psychologically deteriorated, then, of course, he becomes a management problem—a management problem of one form or another.
>
> Tr.–1 at 126.
>
> To me, as a prison manager and practitioner, most important is the fact that men, whose minds can be kept busy, while they're being locked up and secluded, the more active you can keep their minds, based on reality and currency of what's going on in this world, the more you assist in preventing psychological deterioration. To the extent these people do not have access to currency, what's going on in the world, or something to read, their time on

their hands, somehow, gets inverted, and they become psychologically disadvantaged, very quickly. And once they become psychologically troubled, that condition increases in almost geometric proportions. So, you can take a relatively [sane] individual, in a very short time, in the confines of a segregation facility, without access to the free world, and happenings around the world, that person can have severe psychological distress, very quickly.
> Tr.–1 at 87.

**17.** Defendant also argues that "[I]t takes longer to shakedown, the more material that's in there." Tr.–1 at 137. This argument does not explain how the ban on subscription publications deters inmates from concealing contraband. Instead, it goes to the question of the extent to which accommodation of the asserted right would have an impact on prison staff, inmates, and the allocation of prison resources generally, which is considered *infra.*

**18.** Defendant offered no evidence of any kind that Regulation 433, since its promulgation in 1987, has had any actual effect on reported contraband incidents in administrative segregation. Nor has defendant even informed the court as to how many such incidents actually occur in administrative segregation in any given time period.

have more—not fewer—subscription publications.[19] Under these circumstances, the court must conclude that the goal of preventing inmates from hiding contraband is not advanced by Regulation 433, or it would be employed to achieve this end with regard to all inmates—not only in the general population, but also on death row and in protective custody, as well.

Second, as before, other materials—clothing, bedding, legal papers, Bibles, correspondence, library magazines,[20] etc.—can conceal contraband, but these are all permitted for administrative segregation inmates under Regulation 433. The under-inclusiveness of defendant's prohibition on subscription magazines with regard to contraband further suggests that the connection between the regulation and its

stated objective is weak. *Cf. Jackson v. Elrod*, 671 F.Supp. 1508, 1511 (N.D.Ill. 1987) (admission that hard cover books are no greater a risk to conceal contraband than, e.g., clothing, paperbacks, mattresses, light fixtures, and ceilings "disproves defendant's assertion of a rational connection between their hardcover book ban and a governmental interest."). For these reasons, the court does not find a rational relationship between the subscription publications ban and the government's interest in deterring the concealment of contraband.[21]

### b. Weapons

At trial, defendant's expert testified that inmates might make weapons (e.g., "zip guns") out of magazines or newspapers,[22]

19. Plaintiff's counsel and expert Sullivan conducted this exchange at the evidentiary hearing:

Q. What about the contraband issue? Do you think that's less of a concern in segregation than general population?
A. Again, absolutely. Inmate property in segregation is so minimal that a staff person can usually go in and search an inmate's cell quite readily and quickly. In general population, inmates are permitted to have all manner of things, and really, without too much limitation. So, searching a cell in general population is an extremely time-consuming process for staff.
Q. Is there any other reason why a general population inmate would have greater access to contraband than a segregation inmate?
A. Oh, certainly. Comparatively speaking, a general population inmate has as much access to varied contraband, in excess to what segregation can have, as we, in private communities, do over men in general population prisons. They have unlimited access to whatever type contraband, drugs, weapons, and whatever else.
Q. And you say that access to contraband is less, are you saying, in segregation?
A. Oh, absolutely. It should be non-existent. If staff are doing their jobs, such threats are non-existent in segregation.
Tr.–1 at 96–97.
In addition, defendant's witness Frank Griswold agreed with plaintiff's counsel that "there are greater opportunities to have access to contraband in the general population, where prisoners have more visits with the outside world, where they are not searched

nearly as much, and where they have contact with prisoners all day long throughout the institution, than the inmate that is locked down 23 hours a day, and is handcuffed and escorted when he leaves his cell." Tr.–1 at 160. And defendant's expert Newsome also agreed that inmates in general population have more access to contraband than do those in administrative segregation. Tr.–2 at 35.

20. Plaintiff's testimony suggests that library magazines passed out by inmates are more likely to conceal contraband when they reach administrative segregation inmates than are magazines and newspapers mailed by the publisher and delivered by correctional officers from the mail room. Tr.–2 at 56.

21. In *Snyder v. Nagle*, No. CV–91–N–766–S (N.D.Ala. March 16, 1992), a magistrate judge upheld a limit of six subscription publications placed on one general population inmate as "reasonably related to the defendants' concerns relating to contraband and storage." *Id.* at 11 (opinion attached to defendant's Motion to Stay Until Qualified Immunity is Determined). However, Regulation 433 was not at issue, and this case is distinguishable on its facts.

22. "A zip gun can be made out of anything that you can bring it down to the caliber of the bullet that you're putting in it. Most of the time you will see a zip gun made out of a pipe. . . . . [H]e rolled the magazine, the tube, down to the size of a .22, and fired it off with a rubber band and a piece of metal." Tr.–2 at 12–13.

Tr.–2 at 10–13, implicitly suggesting that this might be a rational basis for the subscription regulation. Because defendant himself did not raise this justification for Regulation 433 in either his special report or his post-trial brief, the court declines to consider it.

However, even if this justification were properly raised, the court is persuaded that there is no valid, rational connection between the regulation and deterring prisoners from fabricating weapons. One incident in the Georgia prison system in which an inmate made a zip gun out of a magazine—the only testimony concerning the incidence of such weapons before the court—is not sufficient to justify a blanket ban on magazine and newspaper subscriptions in administrative segregation in Alabama, and clearly would constitute an exaggerated response. Further, magazines from the prison library, along with other materials, may also be used to make zip guns, yet these are not banned. *Cf. Jackson*, 671 F.Supp. at 1511 ("many items permitted in cells—bed pieces, soda pop containers, food trays, rolled-up magazines, game boards, and shoes, for example—have been used as bludgeons. Though deprived of hard cover[ ] [books], detainees manage to fashion knife handles out of wrapped cloth and melted toothbrushes or ball point pens. By admitting in effect that hardcover books pose no greater a security risk than many other items that detainees may receive in the mail and may keep in their cells, [defendants' witness] disproves defendants' assertion of a rational connection between their hardcover book ban and a governmental interest.") (citations omitted).

### c. Altercations

Defendant's expert also testified that a "common problem" in prisons occurs "[w]hen you have an excessive amount of personal property, be it newspapers or magazine[s], and staff wants to remove them, then it becomes an issue. It has

resulted in altercations." Tr.–2 at 5–6. Again, defendant did not raise this justification for Regulation 433 in either his special report or his post-trial brief and, therefore, the court declines to consider it.

Even if this reason for the regulation were properly raised, the court notes again that no evidence before it establishes a valid, rational connection between the regulation and the objective of preventing altercations between inmates and guards over removal of inmate property. *See Nichols v. Nix*, 810 F.Supp. 1448, 1463 (S.D.Iowa 1993) (no evidence of past inmate confrontations relating to publications at issue). Here, there was no testimony from defendant that correctional officials in Alabama actually encountered any significant problems when they removed subscription magazines or newspapers from general population, death row or protective custody cells (where such magazines are currently allowed) for disposal. *See id.* ("Although it is not necessary for an actual prison disruption to occur before correctional officials' security concerns will be deemed reasonable, mere declarations and incantations that a practice might be harmful to prison order, in the absence of a rational and reasonably articulable basis, cannot justify government suppression of [publications]."). Nor was any reason given why, if altercations result from permitting subscription publications, these publications are not banned in classifications other than administrative segregation. Again, the connection between the regulation and its asserted purpose is tenuous, at best. *See Payne*, 325 F.Supp. at 1193 ("Nearly all inmates have personal property; occasionally this might cause disputes, but this problem seems to be susceptible of control by less stringent measures than an absolute bar enforced against possession of such property.").

### 4. Promoting "discipline."[23]

Defendant has not clearly set out the nature of the asserted government interest

**23.** Most of the disciplinary rationales advanced by defendant and discussed below

in discipline in administrative segregation, which is not a disciplinary classification. Nor has he explained exactly how this interest is promoted by the ban on subscription publications. The discipline rationale appeared first in an affidavit attached to defendant's special report, in which former commissioner Ron Jones stated that "this restriction imposes discipline on prisoners who are difficult to control...."[24] In his testimony for defendant at the evidentiary hearing, Frank Griswold said that administrative segregation inmates "pose more of a problem to you than those in the general population. So, you tend to restrict what they have in there, so that you can look at them more often, and just manage what they have in there." Tr.–1 at 141. Defendant's post-trial brief adds that:

> Instilling discipline in inmates serves an important function for both society and the prison administration. Discipline not only helps in the rehabilitation of inmates and the lack of reentry into the prison system, but discipline enables correctional officials to better manage the prison.

Post Trial Brief of the Defendant at 4–5. Defendant also cites two cases in his brief which he says recognize "deterrence of rule infractions" as a legitimate penological interest: *Gregory v. Auger*, 768 F.2d 287, 290 (8th Cir., 1985), and *Daigre v. Maggio*, 719 F.2d 1310, 1313 (5th Cir.1983). Finally, defendant's post-trial brief asserts in connection with the discipline rationale that

> Some inmates want to be in an administrative segregation setting for a variety of reasons. If everything was allowed in administrative segregation that was allowed in general population then more and more inmates would want to go to those lockdown units as they would not have to put up with the day-to[-]day problems and activities they have to encounter in general population. It is much nicer in a single cell, working on lawsuits all day, rather than being outside in the hot sun, hoeing a field. There is no need to add to the attractiveness of a single cell by allowing books, magazines and newspapers.

Post Trial Brief of the Defendant at 4–5.

Defendant's statements concerning "discipline," although not entirely clear, appear to suggest that the ban on subscription publications in Regulation 433:(1) helps correctional officials control and manage difficult inmates by "imposing" discipline; (2) "helps in the rehabilitation of inmates"; (3) deters "reentry into the prison system"; (4) deters "rule infractions"; and (5) deters inmates from seeking assignment to administrative segregation.

The court has some difficulty understanding the first of these rationales. It appears that defendant contends that the

---

were raised improperly. The first appeared only in an affidavit, rather than in defendant's initial special report, and lacked any context or explanation. However, the court permitted testimony on this point over plaintiff's objection because the issue of security was properly before it. The other discipline rationales were raised for the first time in the post-trial brief, and plaintiff had no opportunity to respond to them with testimony or briefing.

**24.** This phrase may be a quotation from an unpublished *per curiam* opinion in *Johnson v. Burton*, 89–7844, 919 F.2d 743 (11th Cir. Oct. 31, 1990). There, the Eleventh Circuit upheld a district court decision against an administrative segregation inmate who complained that books that he ordered were returned to the sender under Regulation 433 without notification to him. The Court based its decision primarily on the fact that appellant failed to object to the magistrate judge's recommendation, and also sought to bring new claims on appeal. In addition, the Court observed that the facts had been undisputed in the lower court, and added that the restrictions involved "reasonably serve to conserve space in tight quarters and to *discipline prisoners who are difficult to control.*" *Id.* at 4. (emphasis added). The Court did not explain or discuss this *dicta* further. This court has carefully studied the *Johnson* opinion—which is not binding precedent under Eleventh Circuit rules, 11th Cir.R. 36–2—and cannot conclude that *Johnson* controls this case.

purpose of the regulation is to make inmates in administrative segregation behave properly. However, defendant has offered no evidence that the rule achieves or could achieve this purpose. The state deprives administrative segregation inmates of subscription reading material under Regulation 433 *before* any specific infraction occurs, and without any exception for good behavior. Administered in this way, the rule logically could have neither punitive nor deterrent value, as it is not linked to the occurrence or non-occurrence of any specific offense.

If the regulation is meant to punish administrative segregation inmates solely for being problem inmates in general, without reference to any specific rule infraction, then the regulation may achieve its purpose (that is, of making life for these inmates more unpleasant)—but the legitimacy of the government interest in such status-based punishment is questionable. *See Guajardo,* 568 F.Supp. at 1366 ("A blanket denial of [the right to receive publications] solely for the purpose of punishment, and not for a legitimate goal of the [department of corrections] in maintaining security or order or in facilitating rehabilitation, would be unconstitutional."). Finally, if the rule is meant to constitute additional punishment for the crimes that brought these inmates into the prison system—assuming that imposing such additional punishment is permissible without due process—there is no reason, for example, that it should not be applied to death row inmates, who presumably committed the crimes most deserving of opprobrium. The court simply cannot discern a valid, rational connection between the purpose asserted and any legitimate government interest in discipline from the evidence before it.[25]

Similarly, if Regulation 433 "helps in the rehabilitation of inmates," as defendant asserts, the court cannot determine how it does so, at least on this record. On the contrary, the only relevant testimony at the hearing tended to show that deprivation of reading materials in segregation caused "psychological deterioration," which in turn caused inmates either to be "very withdrawn, and curl up in infancy, or they become acting out and aggressive people." Tr.–1 at 126.

Defendant's claim that the ban on subscription publications deters "reentry into the prison system" is perhaps a more plausible justification, but this could be asserted about any condition of confinement, no matter how harsh, that makes incarceration unpleasant. Further, defendant presented no evidence in support of its suggestion that Regulation 433 actually has some general or specific deterrent value. Absent such evidence, the court is unwilling to assume that would-be criminals consider the relative lack of reading materials in administrative segregation before breaking the law—and possibly desist as a result. In addition, if decreasing rates of recidivism were indeed defendant's purpose in promulgating the regulation, this rule logically would also apply to general population, death row, and protective custody inmates, not just to administrative segregation inmates.

Defendant's contention that the subscription ban deters "rule infractions" also lacks both logic and evidentiary support. Again, the rule applies whether or not an inmate commits an infraction; thus, it provides no incentive for good behavior. However, defendant's reference to the *Gregory* and *Daigre* cases from the Eighth and Fifth circuits, respectively, suggests that he may intend to make a different argument. In both *Gregory* and *Daigre,* temporary restrictions on prisoners' receipt of certain mail (including subscription publications) in *disciplinary* segregation[26]

**25.** To the extent that defendant claims that the subscription ban helps him manage and control inmate behavior concerning inmate property, the rationale advanced has been previously addressed in the context of the government's interest in security.

**26.** The rule in *Daigre* applied to "administrative and punitive lockdown," but the context

were upheld in part because such restrictions made disciplinary segregation more onerous—which, in turn, discouraged inmates from rule infractions that would result in segregation. *See Gregory,* 768 F.2d at 290; *Daigre,* 719 F.2d at 1313; *see also Guajardo,* 568 F.Supp. at 1366 (Permitting inmates in solitary confinement access to books, magazines and newspapers may " 'water down' the conditions in solitary and make the threat of solitary confinement meaningless.").[27] However, the reasoning of these cases does not apply to administrative segregation inmates, because such segregation is not imposed in the Alabama prison system for disciplinary infractions. P.Ex. 16 (Defendant's admission # 9); Tr.–1 at 159.

Finally, defendant's argument that Regulation 433 deters inmates—who allegedly prefer to "work[ ] on lawsuits all day, rather than being outside in the hot sun, hoeing a field"—from seeking assignment to administrative segregation utterly lacks evidentiary support. The court has before it no basis on which it could conclude that the alternative to administrative segregation in Alabama is farm work, that inmates actually prefer the restrictive conditions of administrative segregation to hoeing, or that the floodgates will open and inundate the prison system with inmates clamoring for a single cell if subscription publications are allowed. Defendant's argument might have more force if applied to disciplinary segregation, where prisoners arguably choose assignment to this classification by breaking rules. *See Daigre,* 719 F.2d at 1313 ("Left free to write to anyone in the world and to receive literature of any kind, a prisoner might find punitive isolation desirable, offering solitude and leisure as an alternative to the ordinary conditions of prison work and life."). However, inmates may be placed in administrative segregation, for example, pending the completion of an investigation or a disciplinary due process hearing, as a result of assignment to close or maximum custody, as an initial placement upon a sentence to life imprisonment without parole, or during evaluation or outpatient treatment for psychological problems. In this connection, inmates certainly do not choose administrative segregation in any straightforward sense, so the deterrent value of the publications rule is, again, doubtful.

For the forgoing reasons, the court cannot conclude that there is a valid, rational connection between the regulation and a legitimate governmental interest put forward to justify it, even under the deferential standard that the court applies to restrictions on First Amendment rights in the prison context. Any other view of this case would render the reasonableness standard toothless, despite the confidence of the United States Supreme Court that this standard will not be so applied. *Abbott,* 490 U.S. at 412, 109 S.Ct. 1874.

## B. *Alternative means of exercising the asserted constitutional right.*

The parties agree that the court must view the constitutional right at issue in this case "sensibly and expansively." *Id.* at 417, 109 S.Ct. 1874. However, they disagree on the definition of that right. Defendant contends that the right in question is "the ability to receive information." Post Trial Brief of Defendant at 5. Plaintiff argues that this right should be more narrowly defined as "the right to receive information that is intellectually stimulating and of interest to *him* [the plaintiff]." Plaintiff's Post–Trial Brief at 12 (emphasis in original). Neither party cites case law defining the right in question. After looking to relevant cases for guidance, the court declines to adopt either definition

---

makes it clear that the plaintiff in that case was in fact in some form of disciplinary segregation. *Daigre,* 719 F.2d at 1312.

**27.** The *Gregory* court found it significant that the policies in question were "not directed at what mail an inmate could receive, but only at when he could receive it." *Gregory,* 768 F.2d at 290 (disciplinary segregation was for no longer than sixty days.). Here, of course, the subscription ban can apply indefinitely.

offered by the parties and instead follows the Supreme Court's practice when it has reviewed alternatives available to inmates in the context of restrictions on publications in prison.

Two Supreme Court cases concerning such restrictions provide some assistance. In *Abbott,* the Court approved regulations authorizing wardens to reject publications mailed to prisoners under certain circumstances (e.g., where the publications were detrimental to the security, good order, or discipline of the institution). Although it discussed whether alternative means were open for exercising the right in question, the Court did not specifically define that right. *Id.* at 416, 109 S.Ct. 1874. Instead, the Court reviewed the alternative publications available to inmates, and determined in that case that "[a]s the regulations at issue in the present case permit a broad range of publications to be sent, received, and read, this factor is clearly satisfied." *Id.* The Court did not canvass prisoners' other options for receiving information (e.g., television, radio, correspondence, visitation) but considered publications exclusively.

Similarly, in *Bell v. Wolfish,* a pre-*Turner* case, the Court discussed only "alternative means of obtaining reading material" in deciding whether to uphold restrictions placed on prisoners' receipt of hard back books to prevent the introduction of contraband into prison. *Bell v. Wolfish,* 441 U.S. 520, 551, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). As in *Abbott,* the *Bell* Court did not inquire whether radios, televisions, correspondence, or other means of obtaining information were available to prisoners. In-

stead, it considered only those written publications available to prisoners as alternatives for exercising the right in question. The Court observed that

> [t]he restriction, as it is now before us, allows soft-bound books and magazines to be received from any source and hardback books to be received from publishers, bookstores, and book clubs. In addition, the MCC has a "relatively large" library for use by inmates.

*Id.* Accordingly, following *Abbott* and *Bell,* this court will consider the written publications available to administrative segregation inmates in order to assess their alternative means of exercising their First Amendment right to receive published written materials through the mail.[28]

In approving the restrictions in question, the *Bell* Court took some comfort from the fact that inmates retained access to an extensive prison library, as well as numerous other publications. The general library described in *Bell* consisted of

> more than 3,000 hardback books, which include general reference texts and fiction and nonfiction works, and more than 5,000 assorted paperbacks, including fiction and nonfiction. The MCC offers for sale to inmates four daily newspapers and certain magazines. Other paperback books and magazines are donated periodically and distributed among the units for inmate use.

*Id.* at n. 33 (citations omitted). Further, as noted above, inmates could receive soft-bound books and magazines from any source and hardback books from publishers, bookstores, and book clubs. *Id.* at 551, 99 S.Ct. 1861. Similarly, the *Abbott*

---

**28.** Radio, of course, is the only alternative news, information and entertainment medium available to administrative segregation inmates in this case, because television is expressly forbidden. The court does not address whether media such as radio or television are fairly viewed as alternatives to the printed word because it follows the Supreme Court's implicit practice of confining its review of alternatives to written publications in cases similar to this one. However, the

court notes that there is considerable popular and academic literature distinguishing the experience of reading from that of watching television or listening to radio. *See, e.g.,* McLuhan, *Understanding Media: The Extensions of Man; see also Mann,* 796 F.2d at 83 ("Whatever the intrinsic merits of television in comparison with newspapers and magazines, the contents of television are different from what one finds in the printed media.").

Court seemed to approve the "broad range of publications" available to inmates as alternatives to excluded publications. Despite the restriction upheld in *Abbott*, inmates could still receive a large number of books, magazines, newspapers, advertising brochures, flyers and catalogs. *Abbott*, 490 U.S. at 405 n. 4, 109 S.Ct. 1874 (defining "publications").

In this case, inmates in administrative segregation cannot have any subscription magazines and newspapers. They have no access whatsoever to a newspaper of any kind, even through the prison library. They can obtain only one non-subscription magazine[29] or book monthly from the prison library, in addition to the single religious book, Alcoholics Anonymous book and Narcotics Anonymous book that are permitted.

Neither plaintiff nor defendant presented any testimony comprehensively describing the written publications available to inmates in Alabama from each institution's library. However, according to plaintiff—at least at Donaldson—the magazines available in the prison libraries are not generally current issues, because they are donated by general population inmates when they are finished with them. Tr.–1 at 19. The library at Donaldson does not have its own subscriptions to magazines. *Id.* Plaintiff is not sure what magazine titles are available from the library—he orders books because they last longer, and there is no list of magazines or books to choose from. However, plaintiff has himself seen only "common magazines" such as *National Geographic, Time* and *Newsweek*. *Id.* at 17–19. Plaintiff has never seen any newspaper in the library at Donaldson. *Id.* at 19. Defendant offered no evidence to contradict plaintiff's testimony concerning Donaldson or to show that more publications were available at any other correctional facility.

While the court cannot conclude from this testimony that *no* alternative reading

material is available to administrative segregation inmates, the inmates' choices clearly are profoundly limited. Although religious works such as the Bible and the Koran undeniably reward re-reading, there is still a limit to the number of hours—in a potentially indefinite period of confinement in administrative lockdown—that an inmate can consume in studying these texts. *Cf. Abbott*, 490 U.S at 417 n. 15, 109 S.Ct. 1874 (referring to Dostoyevsky's *The House of the Dead*, in which prisoners were permitted to read only the Bible). The court has not seen copies of the Alcoholics Anonymous or Narcotics Anonymous books that are permitted but, again, these surely can be read in a matter of days or weeks. Further, with regard to other books and magazines available from the prison library, plaintiff testified:

> [B]ecause I read fairly fast, ... I will use a magazine in 30 to 45 minutes. A large book might last me two days, maybe. It's just a matter of trying to get it, you know, to stretch out a little longer.

Tr.–1 at 20. Even administrative segregation inmates who do not read so fast clearly experience many days in each month in which they have exhausted their reading material. On such days (which would considerably outnumber the days when unread materials are available) inmates' alternative ways of exercising the right in question are not just profoundly limited—they are nil. Under the circumstances, the court cannot conclude that meaningful alternative means of exercising the asserted constitutional right remain open to administrative segregation inmates during the majority of the time that they are in this status.

**C. *The impact on prison staff, inmates, and the allocation of prison resources generally of accommodation of the asserted right.***

Defendant suggests that allowing inmates in administrative segregation to re-

---

**29.** At Easterling, it appears that such inmates may not have magazines of any kind, even

from the library.

ceive subscription magazines or newspapers would cause correctional officials to spend more time searching such publications for contraband. Tr.–1 at 137 ("It just would—it takes longer to shakedown, the more material that's in there."); *see also* Tr.–2 at 7 ("[I]t takes time to process the materials into the lockdown units."). Defendant did not present testimony explaining exactly how magazines and newspapers are searched in the Alabama prison system. Tr.–2 at 34.[30] Nor did he attempt to quantify the total amount of additional time that correctional officers would need to process mail into prisons or conduct shakedowns of cells if administrative segregation inmates had the same access to subscription magazines as did the general population, death row and protective custody. Nor did Defendant argue that such searches will actually require additional staff.

Thus, the evidence before the court concerning the effect of any change in Regulation 433 on prison resources is limited. From the information that the court does have, however, it appears that the expansion of mail privileges sought by plaintiff would likely have minimal consequences for a prison system of this size. Again, as of April 1997, there were only six or seven hundred inmates in administrative segregation throughout the state prison system. Tr.–1 at 148. The total number of inmates housed by the Alabama Department of Corrections at this time was 19,892, so administrative segregation inmates comprised at most approximately 3.5 percent of the total. Of these inmates, the majority could not afford magazine or newspaper subscriptions, according to defendant. Tr.–2 at 10 ("the majority of the inmates in any prison—and I don't think Alabama is any different than most of them—might be worse than most of them—have very little money, and the majority of them wouldn't be able to subscribe to a magazine or newspaper."). In addition, perhaps 40 percent of inmates are illiterate. *See* Tr.–1 at 108; *see also Johnson v. Avery,* 393 U.S. 483, 486, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969) ("Jails and penitentiaries include among their inmates a high percentage of persons who are totally or functionally illiterate, whose educational attainments are slight, and whose intelligence is limited."); *Austin v. Hopper,* 15 F.Supp.2d 1210, 1238 n. 101 (M.D.Ala.1998) ("In a 1996 DOC ranking of the 21,320 inmates in Alabama's prison population, the average educational level was the tenth grade, but the average reading level was below the sixth grade; more than 30% of the inmate population read at the third-grade level or below."). Given the fact that subscription magazines are sent to inmates by publishers rather than family or friends—and, thus, are unlikely to conceal contraband [31]—any additional contraband searches in the mail room may not be particularly onerous.[32] Further, shakedowns in administrative segregation cells should be less difficult to

---

**30.** Administrative Regulation 301, which concerns institutional security, simply instructs correctional officers to "[s]earch all envelopes, books, packages, magazines for contraband being concealed within these items." P.Ex. 3 at 2(b)(13). In addition, defendant's expert was asked at the hearing how magazines are searched for contraband:

> Q. Is that how it's done in Alabama? Do they turn each page before they give a magazine to someone in general population? A. I couldn't tell you. I haven't stood there and watched them go over it, page by page, to do it. You can do it that way, you can put it through a fluoroscope to determine if it can detect any items in it. But it has to be looked at....

*Id.*

**31.** In *Bell*, the warden testified, and the Court appeared to accept, that " 'there is relatively little risk that material received directly from a publisher or book club would contain contraband....' " *Bell*, 441 U.S. at 549, 99 S.Ct. 1861.

**32.** Under Administrative Regulation 303, "[i]nmates shall not be utilized to handle mail." P.Ex. 4 at XVIII. In contrast, inmates do handle magazines and books delivered from the library on the book cart—and sometimes pass on contraband by this means. Tr.–2 at 56.

conduct for these inmates than for general population inmates permitted to receive magazines and newspapers because the latter, again, have much greater access to contraband. *See* Note 18, *supra.* Accordingly, any additional time or trouble to prison staff caused by accommodation of the right in question appears, in context, to be *de minimis.*

This conclusion is underscored by defendant's own policies. The Administrative Regulations and SOP's before the court reflect no limit on the quantity of mail (excluding packages) that inmates normally may receive, and that correctional officials therefore must search. *See* P.Ex. 4, 9. Also, the prison permits inmates to accumulate as much property as can be stored in a personal locker or similar storage area. P.Ex. 4.; P.Ex. 10. Thus, prison officials have already committed the resources necessary to conduct searches for contraband: (1) in the mail room, for as much mail as happens to arrive for inmates on any given day, an amount which is clearly variable; and (2) in individual cells, for as much material (publications or otherwise) as can fit in a storage box. Accommodation of the right asserted in this case obviously fits within the tolerances established by these policies. Accordingly, the court concludes that any burden resulting from the exercise of the right would be negligible, at best. Certainly the impact of a change in Regulation 433 would not be "significantly less liberty and safety for everyone else, guards and other prisoners alike.'" *Abbott,* 490 U.S. at 417, 109 S.Ct. 1874 (quoting *Turner,* 482 U.S. at 92, 107 S.Ct. 2254).

**D. *The regulation as an "exaggerated response" to prison concerns.***

The Supreme Court has suggested that one way to determine whether a regulation represents an exaggerated response to the prison's concerns is to look at available alternatives. "The existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an exaggerated response to prison concerns.... But if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, the court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Id.* at 418, 109 S.Ct. 1874 (citation and internal quotation marks omitted). Here, plaintiff argues that defendant has an "easy, cost-free" alternative to banning all subscription publications in administrative segregation: to limit the quantity of newspapers and magazines allowed to a reasonable number (e.g., the number permitted in the general population, death row, and administrative segregation) and to enforce current regulations restricting personal property to the amount that will fit in approved storage containers.

The court agrees that the existence of this alternative—which would address security, fire, and sanitation concerns without otherwise altering the prison's existing rules—constitutes evidence that defendant's response is indeed exaggerated. Further, the fact that other correctional systems readily permit administrative segregation inmates more reading material than does the state of Alabama also suggests that defendant has overreacted. *See, e.g.,* P.Ex. 15 at 14 (Federal Bureau of Prisons regulations); *see also* P.Ex. 17 at 6 (State of New York Department of Correctional Services regulations) (allowing 10 books, magazines or newspapers after 30 days in administrative segregation); P.Ex. 20 at 6 (Pelican Bay State Prison regulations) (permitting 10 books and magazines in administrative segregation and implicitly permitting newspapers up to 14 days old). In addition, the American Correctional Association Standards for Adult Correctional Institutions (ACA standards) affirm that inmates in segregation "should be provided a sufficient quantity of reading materials and have an opportunity to borrow reading materials from the institution's library," and that administrative segregation library services should generally

be similar to those for the general population. P.Ex. 21.[33] These examples strongly suggest that Regulation 433's absolute ban on subscription publications in administrative segregation is exaggerated.

### III. Conclusion.

Although prison officials may find it inconvenient to give administrative segregation inmates reasonable access to subscription newspapers and magazines, defendant has not suggested how such access is actually inconsistent with any legitimate prison function. *See Mann*, 796 F.2d at 83. This is not to say that restricting inmates from receiving such publications for a limited period of time [34] and for specific fire, security or health reasons is not permissible.[35] But an *a priori*, permanent, across-the-board, and (in some cases) lifetime prohibition of all subscription publications in administrative segregation—where there are virtually no alternative publications available, and there is no punitive justification for the restriction—offends the Constitution even under the most deferential standard.

Accordingly, it is the RECOMMENDATION of the MAGISTRATE JUDGE that the court enter judgment for plaintiff in this case, and grant appropriate declaratory and injunctive relief. Plaintiff is hereby DIRECTED to submit a proposed draft of a permanent declaratory and injunctive order for the court's review, and a brief addressing the legal standards applicable to fashioning an appropriate remedy in this case—if the court must in fact approve any remedy—on or before September 7, 1999. Defendant's response to this submission is due on September 21, 1999.

Plaintiff may reply on or before September 28, 1999.

### ORDER

The Clerk of the Court is ORDERED to file the Recommendation of the Magistrate Judge and to serve by mail a copy thereof on the parties to this action. The parties are DIRECTED to file any objections to the said Recommendation within a period of thirteen days from the date of mailing to them. Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation objected to. Frivolous, conclusive or general objections will not be considered by the District Court.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a de novo determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir.1982). *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir.1982). *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981), *en banc*, adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Aug. 25, 1999.

---

**33.** Even defendant's own expert seemed to believe that one book or magazine once a month from the prison library was inadequate. Newsome testified: "My personal opinion is, I would like to see them have more of an opportunity to get the reading materials." Tr.–2 at 17.

**34.** *See Bell*, 441 U.S. at 551, 99 S.Ct. 1861 (approving publishers-only rule limited to maximum of 60 days); *Hause v. Vaught*, 993 F.2d 1079, 1082 (4th Cir.1993) (finding denial of certain publications had minimal impact when detainees held 60 days or less); *Auger*, 768 F.2d at 290 (upholding temporary deprivation of mail in disciplinary detention); *cf. Austin*, 15 F.Supp.2d at 1236 (permanent elimination of visitation rights could present "a question of constitutional breach.").

**35.** For example, an inmate who actually set fires, violently resisted disposal of old newspapers, made weapons, or persistently refused to clean his cell might reasonably be subject to restrictions on his receipt of publications.